IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JUSTIN LYTLE AND CHRISTINE MUSTHALER,
*Plaintiffs and Respondents,*

vs.

NUTRAMAX LABORATORIES, INC. AND NUTRAMAX LABORATORIES VETERINARY
SCIENCES, INC.,
*Defendants and Petitioners.*

On Appeal from the United States District Court
for the Central District of California,
Case No. 5:19-CV-00835
Honorable Fernando M. Olguin

## PETITION FOR PERMISSION TO APPEAL ORDER GRANTING
## CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23(f)

Amy P. Lally (SBN 198555)
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, California 90067
Telephone: 310-595-9662
Facsimile: 310-595-9501
alally@sidley.com

Joshua A. Glikin
BOWIE & JENSEN, LLC
210 West Pennsylvania Ave., Suite 400
Towson, Maryland 21204
Telephone: 410-583-2400
Fascimile: 410-583-2437
glikin@bowie-jensen.com

David R. Carpenter (SBN 230299)
Sean A. Commons (SBN 217603)
Nicole M. Baade (SBN 335703)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: 213-896-6000
Facsimile: 213-896-6600
drcarpenter@sidley.com
scommons@sidley.com
nbaade@sidley.com

*Attorneys for Defendants and Petitioners Nutramax Laboratories, Inc. and
Nutramax Laboratories Veterinary Sciences, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1,

Defendants and Petitioners Nutramax Laboratories, Inc. and

Nutramax Laboratories Veterinary Sciences, Inc. state as follows:

1. Nutramax Laboratories, Inc. is a privately held company. It is not publicly traded, and no public entity owns 10% or more of the company's stock.

2. Nutramax Laboratories Veterinary Sciences, Inc. is a privately held company. It is not publicly traded, and no public entity owns 10% or more of the company's stock.

Dated: May 20, 2022       Respectfully submitted,

                          SIDLEY AUSTIN LLP

                          By:/s/ *David R. Carpenter*
                            David R. Carpenter
                            Attorney for Defendants-
                            Petitioners

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................... 1

QUESTION PRESENTED .................................................. 4

BACKGROUND TO THE PETITION ............................. 4

    A.   Background to the Parties and Plaintiffs' Allegations .............................................. 4

    B.   Plaintiffs' Expert on Classwide Injury ................. 6

    C.   The Order on Plaintiffs' Motion for Class Certification ............................................. 8

JURISDICTIONAL STATEMENT ................................. 9

STANDARD FOR RULE 23(f) PETITIONS ...................10

REASONS FOR GRANTING THE PETITION ............. 11

    A.   Whether a Proposed Expert Analysis Proffered to Satisfy Rule 23 Must Be Performed at the Class Certification Stage Is a Fundamental, Recurring, and Unsettled Issue for Consumer Class Actions. .............................................. 11

    B.   Plaintiffs Cannot Meet Their Burden of Satisfying Rule 23 by a Preponderance of the Evidence by Merely Proposing to Run an Expert Model, Without Actually Conducting It or Knowing What the Model Would Show. ...................................... 18

CONCLUSION ............................................................. 29

CERTIFICATE OF COMPLIANCE ............................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailey v. Rite Aid Corp.*,
    338 F.R.D. 390 (N.D. Cal. 2021) ....................................... 8, 9, 14

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005) ......................................... 10, 11, 16

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ............................................................*passim*

*Duran v. U.S. Bank Nat'l Ass'n*,
    59 Cal.4th 1 (2014) ................................................................. 28

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ................................................................. 19

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014).......................................... 14, 15

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales
Pracs. & Antitrust Litig.*,
    No. 17-md-2785, 2020 WL 1180550 (D. Kan. Mar.
    10, 2020).................................................................................. 16

*In re Ethylene Propylene Diene Monomer (EPDM)
Antitrust Litig.*,
    256 F.R.D. 82 (D. Conn. 2009) ................................................ 16

*In re NJOY, Inc. Consumer Class Action Litig.*,
    120 F. Supp. 3d 1050 (C.D. Cal. 2015) ..................................... 17

*In re Pom Wonderful LLC Mktg. & Sales Pracs. Litig.*,
    No. ML 10-02199, 2014 WL 1225184 (C.D. Cal. Mar.
    25, 2014).................................................................................. 24

*In re Wellbutrin XL Antitrust Litig.*,
  282 F.R.D. 126 (E.D. Pa. 2011) ................................................. 16

*Kottaras v. Whole Foods Mkt., Inc.*,
  281 F.R.D. 16 (D.D.C. 2012) ...................................................... 15

*Leyva v. Medline Indus., Inc.*,
  716 F.3d 510 (9th Cir. 2013) ..................................................... 28

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012), *overruled on other
  grounds by Olean*, 31 F.4th 651................................................. 24

*Microsoft Corp. v. Baker*,
  137 S. Ct. 1702 (2017) ............................................. 10, 11, 17, 18

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble
  Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022).................................................*passim*

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011), *abrogated on other
  grounds by Comcast Corp. v. Behrend*, 569 U.S. 27
  (2013) .................................................................................. 6, 29

*Testone v. Barlean's Organic Oils, LLC*,
  No. 19-CV-169, 2021 WL 4438391 (S.D. Cal. Sept.
  28, 2021)..................................................................................... 14

*Townsend v. Monster Beverage Corp.*,
  303 F. Supp. 3d 1010 (C.D. Cal. 2018) ...................................... 17

*Vizcarra v. Unilever U.S., Inc.*,
  339 F.R.D. 530 (N.D. Cal. 2021) ................................................ 17

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................ 19, 20

*Weisfeld v. Sun Chem. Corp.*,
  84 F. App'x 257 (3rd Cir. 2004)................................................. 15

**Statutes and Rules**

28 U.S.C. § 1292(b).............................................................. 10

28 U.S.C. § 1332(d) ........................................................... 9, 10

Fed. R. Evid. 702 ..................................................... 3, 7, 24, 26

Fed. R. Evid. 702(b)............................................. 3, 24, 25, 26

Fed. R. Evid. 702(c) ................................................... 24, 25

Fed. R. Evid. 702(d) ................................. 3, 24, 25, 26, 27

Fed. R. Civ. P. 23................................................... *passim*

Fed. R. Civ. P. 23(b) ..................................................... 20

Fed. R. Civ. P. 23(b)(3)............................................ *passim*

Fed. R. Civ. P. 23(f) ............................................... 3, 10

**Other Authorities**

Advisory Committee's 1998 Notes.................................. 10

# INTRODUCTION

In *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc), this Court held that plaintiffs must prove the facts necessary to establish the prerequisites of Rule 23 "by a preponderance of the evidence." This Petition involves whether a plaintiff can meet that burden of proof by proffering an expert who says that he *could* run a model to assess classwide injury—but where he has not yet done so and does not know what the results of his analysis would show.

This question presented is an unsettled and fundamental issue on which courts have disagreed. In granting class certification, the district court adopted the view, expressed by certain other lower courts, that a "plaintiff is not required to actually execute a proposed conjoint analysis" to support class certification in an alleged false advertising class action. Pet.App. 10, 33 n.21. Other courts have found to the contrary: if expert testimony is necessary to show a common injury, and the expert has not actually performed the analysis, then the plaintiff has not presented *evidence* necessary to affirmatively satisfy Rule 23.

The Court should grant the Petition to resolve the dispute, which has widespread repercussions for class action practice. The question is particularly ripe for review following *Olean*, which established the preponderance-of-the-evidence burden of proof but had no occasion to resolve the current dispute because (unlike here) the plaintiffs' experts in fact performed comprehensive regression analyses, the admissibility of which went unchallenged.

Upon granting the Petition, the Court should hold that, where the existence of a common injury is disputed, an expert must conduct an analysis that is admissible and, upon a rigorous analysis, would establish classwide injury if accepted by the jury. It is not enough to proffer a general methodology that *theoretically* could show classwide injury, *if* a common injury existed and *if* the analysis were reliably performed. Plaintiffs should not be able to avoid case-specific challenges to their expert's model simply by not actually executing one.

The record here reflects the importance of actually executing the analysis. Plaintiffs challenge as deceptive four product statements—only *one* of which was uniformly made on all

packages during the class period. If a conjoint analysis showed no price premium associated with the only common statement (which Plaintiffs' expert conceded could be the case), then the class would devolve into individualized inquiries into whether consumers were exposed to any of the other challenged statements.

As another example, Federal Rule of Evidence 702 does not merely require use of an accepted methodology; it also requires that the opinion be "based on sufficient facts or data" and that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (d). At deposition, Plaintiffs' expert admitted that he had not collected the data for his analysis, and he had not formulated a specific plan to collect all the data, perform the survey, or run his price-premium model. Under the circumstances, there was no way for the district court to properly evaluate whether Rule 702 was satisfied—much less perform the required rigorous analysis.

For these reasons, the Court should grant this Petition to appeal under Rule 23(f) and, on the merits, reverse the order granting class certification.

## QUESTION PRESENTED

To establish predominance by a preponderance of the evidence, was Plaintiffs' expert required to perform an analysis that is admissible and, upon rigorous analysis, capable of establishing classwide injury? Or was it sufficient for Plaintiffs' expert to describe a general methodology, without actually applying it?

## BACKGROUND TO THE PETITION

### A.     Background to the Parties and Plaintiffs' Allegations

Nutramax Laboratories, Inc. and Nutramax Laboratories Veterinary Sciences, Inc. (collectively, "Nutramax") research, develop, manufacture, and sell supplements for both humans and household pets. Pet.App.2. This action concerns the sale of three Nutramax Cosequin® brand canine joint health supplements that contain glucosamine and chondroitin. Pet.App.2–3.

Plaintiffs Justin Lytle and Christine Musthaler (collectively, "Plaintiffs") both purchased Cosequin® DS Maximum Strength Plus MSM for their elderly, ill dogs, with their last purchases in February 2019. Pet.App.2, 16. Plaintiffs allege that they did not see improvements in their dogs after giving them Cosequin® and challenge the effectiveness of the products (particularly for treating arthritis). *Id.* Nutramax, in turns, maintains that the

products are not intended or represented as being able to treat disease and that substantial scientific evidence shows that the products are effective in providing the represented benefits: supporting joint health. *See, e.g.*, Dkt. 120, at 4 & n.3 (Joint Br. on Class Certification).

Pursuant to Federal Rule of Civil Procedure 23(b)(3) Plaintiffs moved to certify a putative statewide class of purchasers of three different Cosequin® products, asserting claims for violation of California's Consumer Legal Remedies Act ("CLRA"). Pet.App.1–3, 35.[1] For their class claims, Plaintiffs challenge as deceptive four statements that have appeared on various product labels: (1) "Use Cosequin to help your pet Climb stairs, Rise, and Jump!"; (2) "Joint Health Supplement"; (3) "Support Mobility for a Healthy Lifestyle"; and (4) "Mobility, Cartilage and Joint Health Support." Pet.App.12.

---

[1] Specifically, the class is defined as "[a]ll persons residing in California who purchased during the limitations period the following canine Cosequin products for personal use: Cosequin DS Maximum Strength Chewable Tablets; Cosequin DS Maximum Strength Plus MSM Chewable Tablets; and Cosequin DS Maximum Strength Plus MSM Soft Chews." Pet.App.35.

Of the four contested claims above, however, only the generic descriptor "Joint Health Supplement" appeared on all packages through the class. Pet.App.17–18. The packaging otherwise varied during the putative class period and only a small percentage of products, as measured by sales, involved one of the other three claims. Pet.App.26 n.17 (citing Dkt. 120, at 30); *see also* Dkt. 96, Ex. 30, ¶ 32 (Moore Decl.) (over 90% of gross profits attributable to the three Cosequin® products at issue that did *not* contain the other three challenged claims).

## B. Plaintiffs' Expert on Classwide Injury

As the district court recited, "[t]o establish a CLRA claim, the plaintiff must show that: (1) the defendant's conduct was deceptive; and (2) the deception caused plaintiff harm. In the class context, a CLRA claim 'requires each class member to have an actual injury caused by the unlawful practice.'" Pet.App.24 (citations omitted) (quoting *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)).

To show that the challenged statements injured consumers

on a classwide basis, Plaintiffs proffered Professor Jean-Pierre H. Dubé, who said that he would perform a choice-based conjoint analysis. Pet.App.9–10, 31. Dubé proposed using a consumer survey to "'determine the value consumers place on the challenged terms when purchasing these products,'" and then to use the survey "'to calculate the price premium attributable to the challenged terms and the resulting classwide damages.'" Pet.App.31 (quoting Dkt. 120, at 37). Plaintiffs argued that the "'proposed model will account for both demand and supply-side factors, and the calculation will not require individualized inquiry.'" *Id.* (quoting Dkt. 120, at 37).

However, as of the class certification briefing and decision— which occurred *after* the close of discovery, *including expert discovery*—Dubé had not actually conducted a conjoint survey or performed such an analysis. Pet.App.10. Nutramax moved to exclude Dubé's declaration on that basis and under Rule 702, observing, among other things, that Dubé had not assessed whether there are "'any economic damages associated with the challenged claims,'" or whether as to any challenged statement

"'the price premium is zero or nonzero.'" Dkt. 124, at 5 (Joint Br. on Defs.' Mot. to Exclude Ops. and Test. of Pls.' Expert Witness, Dr. Jean-Pierre Dubé). Nutramax also explained, among other things, that Dubé had not yet compiled necessary data on the relevant market and product sales, had not developed a specific plan for carrying out a consumer preference survey, and had not determined how he would formulate his price-premium model. *Id.* at 5–7.

### C. The Order on Plaintiffs' Motion for Class Certification

On May 6, 2022, the district court entered its order granting class certification and denying Nutramax's motion to exclude Dubé's opinions and testimony. The district court acknowledged Nutramax's argument that Dubé had only proposed a method of analysis but had not "'performed a damages analysis using actual evidence.'" Pet.App.10 (quoting Dkt. 124, at 5). The district court, however, reasoned that a "'plaintiff is not required to actually execute a proposed conjoint analysis to show that damages are capable of determination on a class-wide basis with common proof.'" Pet.App.10 (quoting *Bailey v. Rite Aid Corp.*, 338 F.R.D.

390, 408 n.14 (N.D. Cal. 2021)).

As to Rule 23(b)(3)'s predominance requirement, the district court likewise found that Dubé's proposal to perform a conjoint survey was sufficient. Pet.App.30–33. The district court noted that "[c]onjoint surveys, like the one proposed by plaintiffs' expert, are a well-established method for measuring class-wide damages in CLRA mislabeling cases." Pet.App.31 (citing cases). The court again brushed aside Nutramax's arguments that no analysis had been performed, repeating the view that "'[a] plaintiff is not required to actually execute a proposed conjoint analysis to show that damages are capable of determination on a class-wide basis with common proof.'" Pet.App.33 n.21 (quoting *Bailey*, 338 F.R.D. at 408 n.14).[2]

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction exists under the Class Action

---

[2] Plaintiffs' class certification motion relied on another expert to support their theory that the challenged claims were deceptive. Pet.App.6. Defendants also objected to that expert and disputed Plaintiffs' ability to satisfy other aspects of the Rule 23 requirements. Pet.App.6–9. Those disputes are not the focus of this Petition, although Defendants reserve the right to raise them if permission to appeal is granted.

Fairness Act. 28 U.S.C. § 1332(d); Dkt. 53, ¶ 13 (Second Amended Complaint). Nutramax has timely petitioned for review because they filed this Petition within fourteen days of the order granting class certification, which was entered on May 6, 2022. *See* Fed. R. Civ. P. 23(f).

## STANDARD FOR RULE 23(f) PETITIONS

"Rule 23(f) authorizes 'permissive interlocutory appeal' from adverse class-certification orders in the sole discretion of the court of appeals." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1709 (2017) (quoting Advisory Committee's 1998 Notes). "Courts of appeals wield 'unfettered discretion' under Rule 23(f), akin to the discretion afforded circuit courts under § 1292(b)," except that Rule 23(f) "requires neither district court certification nor adherence to § 1292(b)'s other 'limiting requirements.'" *Id.* (quoting Advisory Committee's 1998 Notes).

The Advisory Committee notes and this Court's precedents provide guidance that review may be most appropriate where: (1) "there is a death-knell situation," (2) "the certification decision presents an unsettled and fundamental issue of law relating to

class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review," or (3) "the district court's class certification decision is manifestly erroneous." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005); *see also Baker*, 137 S. Ct. at 1711. "Even so," the Supreme Court recently emphasized, "the Rule allows courts of appeals to grant or deny review 'on the basis of *any* consideration.'" *Baker*, 137 S. Ct. at 1711 (quoting Advisory Committee's 1998 Notes).

## REASONS FOR GRANTING THE PETITION

### A. Whether a Proposed Expert Analysis Proffered to Satisfy Rule 23 Must Be Performed at the Class Certification Stage Is a Fundamental, Recurring, and Unsettled Issue for Consumer Class Actions.

*Olean* held that a plaintiff bears the burden of proving the prerequisites for class certification by a preponderance of the evidence, but it did not address the specific question presented here: whether to satisfy that evidentiary burden, the plaintiff's expert must actually conduct an analysis or can merely propose to conduct one. That is a fundamental and recurring question that has divided courts and calls for resolution.

1.  In *Olean*, this Court held that "plaintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean*, 31 F.4th at 665. When plaintiffs rely on an expert to meet those requirements, they do not need to prove that the jury will find the theory "persuasive[]," but they must show "that the evidence is admissible and, after rigorous review, … capable of establishing [the unlawful] impact on a class-wide basis." *Id.* at 678.

Notably, in *Olean*, the plaintiffs' experts in fact performed regression models to show classwide impact for the subclasses. For example, for the direct-purchaser subclass, the plaintiffs' expert analyzed a "comprehensive range of available information" and constructed a model that found a "statistically significant" overcharge; the expert then "performed several tests (which he referred to as 'robustness checks') … to confirm the reliability of the model" and "support[] his ultimate conclusion that the model could be used to show class-wide injury." *Id.* at 670–73. The experts for the other subclasses likewise each "conducted a

regression analysis" to determine the overcharge. *Id.* at 683–84.

The defendants did not challenge the admissibility of the expert evidence and thus forfeited any issue in that respect. *Id.* at 665. Although defendants criticized the specifics of the experts' models, the experts responded to those criticisms, and the district court conducted a "rigorous analysis" in which it addressed and resolved those disputes. *See id.* at 673–76, 680–81, 682–84.

*Olean* concluded by explaining that "a district court does not abuse its discretion in concluding that a regression model … may be *capable* of showing class-wide antitrust impact, provided that the district court considers factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs such as false positives) and resolves disputes raised by the parties." *Olean*, 31 F.4th at 683. The *Olean* Court had no occasion to address whether the plaintiffs could have satisfied their burden by citing the *possibility* of developing a regression model, without actually developing the model's assumptions, inputs, or outputs, obtaining the necessary data to execute the model, or running the model—none of which occurred

in this case.

2. As the district court here observed, conjoint surveys and analyses are often used in consumer class actions to evaluate the potential price premium associated with challenged labeling statements. Pet.App.10–11 (collecting cases). However, "[t]here is a divide among district courts within the Ninth Circuit as to whether a proposed conjoint analysis must be performed at the class certification stage" to satisfy the plaintiff's burden. *Testone v. Barlean's Organic Oils, LLC*, No. 19-CV-169, 2021 WL 4438391, at *17 (S.D. Cal. Sept. 28, 2021) (citing cases).

The district court here sided with cases finding that a "'plaintiff is not required to actually execute a proposed conjoint analysis to show that damages are capable of determination on a class-wide basis with common proof.'" Pet.App.10 (quoting *Bailey*, 338 F.R.D. at 408 n.14); *see also, e.g.*, *Testone*, 2021 WL 4438391, at *17.

The district court in *In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014), took the opposite view where the plaintiffs' expert filed a declaration stating that "it is possible to determine

damages on a classwide basis" but he "made no attempt to do so." *Id.* at 577. The court explained that, although the expert described the "methods he would use to make the calculation—hedonic regression and conjoint analysis—he does not report that he has actually employed them to identify the price premium he believes will provide the classwide measure of relief. This alone suffices to support a finding that plaintiffs have not shown that damages can be calculated on a classwide basis." *Id.* at 577–78.

Decisions in other circuits are consistent with *ConAgra. See, e.g.*, *Weisfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 264 (3rd Cir. 2004) (expert report that "contains only bare conclusions and a statement that the expert 'proposes' to use a multiple regression model (which may not take into account all relevant variables) … is insufficient to satisfy the predominance requirement of Rule 23(b)(3)"); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25–26 (D.D.C. 2012) (refusing to certify a class where plaintiff's regression methodology was "too vague," and the expert simply "*plans* to run a regression analysis" but had "not yet performed a single regression" (emphasis added)). Plaintiffs' briefing below

cited out-of-circuit cases purportedly supporting their approach, Dkt. 124, at 9–10, although in several cases they cite, the plaintiffs' experts in fact performed analyses and calculations.[3]

3. The question presented by this Petition is thus both "unsettled" and "fundamental" to class action practice. *Chamberlan*, 402 F.3d at 959. It is "unsettled" because the issue has divided lower courts and needs to be considered in light of *Olean*'s newly established preponderance-of-the-evidence standard.

The issue is also recurring and fundamental. There are numerous cases in which courts have found a conjoint analysis insufficient to support class certification, based on an analysis of

---

[3] *See, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-md-2785, 2020 WL 1180550, at *19–20, *24 (D. Kan. Mar. 10, 2020) (reflecting calculations performed by plaintiff expert Rosenthal); *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 140–44 (E.D. Pa. 2011) (discussing calculations and findings by plaintiffs' expert: "Professor Rosenthal has presented class-wide evidence to demonstrate the existence of both a generic and branded overcharge"); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 85 (D. Conn. 2009) ("plaintiffs have submitted an econometric multiple regression analysis" showing price impact).

facts specific to the case and model presented. *See, e.g.*, *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118–22 (C.D. Cal. 2015) (rejecting proposed conjoint analysis for failure to take into account supply-side factors); *Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 553–55 (N.D. Cal. 2021) (rejecting proposed conjoint analysis where survey was not designed to test the alleged misrepresentations); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1048–51 (C.D. Cal. 2018) (rejecting proposed conjoint survey design as suffering from "focalism"). Under Plaintiffs' and the district court's approach, however, plaintiffs in any consumer fraud case need only identify a general methodology (conjoint analysis) to establish classwide injury and damages. In effect, plaintiffs could immunize themselves from any case-specific challenges to their model at the Rule 23 stage simply by declining to conduct any specific analysis.

As courts have recognized, class certification is frequently the most significant decision point in a case: once a class action is certified, defendants may feel pressured to settle based on the *in terrorem* effect of the alleged damages even in non-meritorious

claims. *See Baker*, 137 S. Ct. at 1708; *Olean*, 31 F.4th at 685–86

(Lee, J., dissenting). If the mere *proffer* of an expert model of

damages were sufficient to certify a class, many cases will lead to

settlement and evade review, even where the proffered damages

model—if actually executed—would end up being fundamentally

flawed, inadmissible, ill-fitted to the plaintiffs' theory, or

otherwise incapable of proving the alleged classwide injury.

Moreover, whichever way the appeal is resolved on the merits,

clarity on the standards will benefit litigants and courts by

allowing them to manage deadlines for class certification and

discovery, and by promoting consistency of decisions across cases.

**B.  Plaintiffs Cannot Meet Their Burden of Satisfying Rule 23 by a Preponderance of the Evidence by Merely Proposing to Run an Expert Model, Without Actually Conducting It or Knowing What the Model Would Show.**

On the merits, the Court should hold that where plaintiffs

are relying on expert evidence to show the existence of a classwide

injury, then their expert must actually conduct an analysis

presenting such evidence at the class certification stage. Indeed,

the facts of this case illustrate the rule, as Plaintiffs' expert does

not even know whether he will find a classwide impact that fits with Plaintiffs' theory of the case or will show that either of the named Plaintiffs were injured. Until Plaintiffs' expert performs his analysis, there is no way for the district court to properly evaluate the admissibility of his opinion or to conduct the rigorous analysis required by Rule 23.

1. Plaintiffs' and the district court's approach is contrary to Supreme Court precedent, as well as the preponderance-of-the-evidence standard adopted in *Olean*.

As the Supreme Court has explained, "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)" and must carry their burden of proof "before class certification." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014); *see also Comcast*, 569 U.S. at 33 (a plaintiff "'must affirmatively demonstrate his compliance'" with Rule 23 and

satisfy the requirements of Rule 23(b) "through evidentiary proof" (quoting *Wal-Mart*, 564 U.S. at 350)).

In *Comcast*, the Supreme Court applied these principles to the evaluation of an expert's model purporting to show classwide antitrust impact. The district court certified a class, and the court of appeals affirmed on the logic that damages need not be proven with certainty at certification, and any challenge to the model was a premature attack on the merits of the methodology. *Comcast*, 569 U.S. at 35.

The Supreme Court rejected that approach: courts may not "refus[e] to entertain arguments against respondents' damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination." *Id.* at 34. "Under that logic, at the class-certification stage *any* method of measurement [would be] acceptable so long as it can be applied classwide …." *Id.* at 35–36. "Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 36. The Supreme Court found that the expert's model, as applied, was not adequately tied to the legal

theories in the case and thus "falls far short of establishing that damages are capable of measurement on a classwide basis." *Id.* at 34; *see also id.* at 37–38 & n.6.

Drawing on these precedents, *Olean* established that plaintiffs must prove through "admissible evidence" the facts necessary to carry their Rule 23 burden of proof "by a preponderance of the evidence." *Olean*, 31 F.4th at 665. *Olean* also emphasized that the district court must conduct a "rigorous analysis" that considers the reliability of the expert's model— including its "assumptions," "inputs," and "outputs"—and that "resolves disputes raised by the parties" where relevant to the Rule 23 analysis. *Id.* at 669, 683.

Under these precedents and the preponderance-of-the-evidence standard, it cannot be enough to assert that, in theory, a conjoint analysis could be developed later in the case assuming certain evidence will be available. A proffer to create expert evidence that *possibly* could show common injury is not equivalent to presenting admissible evidence itself or affirmatively proving *facts* showing predominance.

If mere identification of a statistical technique satisfies a plaintiff's burden to show common injury, then simply identifying "conjoint analysis" in any price premium case will always be enough. "Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 36.

Absent an actual, executed damages model, the district court would never be able to conduct a rigorous analysis into whether the model, *as executed*, in fact fits a plaintiff's theory of liability, is sufficiently reliable to proceed to the jury, or is capable of showing a classwide impact if believed by the jury. Likewise, the district court would never need to resolve disputes over the expert's proposed conjoint model, because until the expert specifies his or her assumptions, inputs, and outputs, there would be no concrete disputes to resolve.

2. In multiple respects, the record here confirms why *conducting* a conjoint analysis—and not merely *proposing* to perform one—is necessary to the meet the preponderance-of-the-evidence standard of proof.

*First*, this case involves multiple challenged statements, only

one of which—"Joint Health Supplement"—was used on all products throughout the class period. *See* Pet.App.17–18, 26 & n.17. As Plaintiffs' expert conceded in deposition, he does not know what the results of a conjoint analysis would be or whether the price premium associated with that statement "'would come out to zero.'" Dkt. 124, at 2. If Dubé's conjoint analysis found no price premium associated with the "Joint Health Supplement" statement, then his model would be incapable of showing a classwide impact. As in *Comcast*, there would be no fit between Plaintiffs' theory of classwide exposure and Dubé's damages model. *See Comcast*, 569 U.S. at 34–38 (model insufficient to satisfy Rule 23(b)(3) where only one of four theories was amenable to common proof, but plaintiffs' damages model was not tied to that specific theory).

This problem is not merely a merits issue; it goes directly to Plaintiffs' ability to prove predominance. For example, Dubé could find no price premium associated with the generic "Joint Health Supplement" statement, yet could find a price premium associated with more descriptive statements that were not used classwide,

such as "Use Cosequin to help your pet Climb stairs, Rise, and Jump!" In that situation, the case would devolve into individualized inquiries into which class members were exposed to which statements because California law does not allow consumers to recover based on alleged misrepresentations to which they were not exposed.[4] Such results also would call into question Plaintiffs' typicality, since the labeling and packaging on the product that Plaintiffs bought did not contain three of the four challenged claims. Pet.App.17.

*Second*, on the record here, the district court had no ability to properly conduct even a basic admissibility assessment—much less the "rigorous analysis" that occurred in *Olean*. Under Rule 702, to be admissible, expert opinion must be "based on sufficient facts or data," it must be "the product of reliable principles and methods," and the expert must have "reliably applied the

---

[4] *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012), *overruled on other grounds by Olean*, 31 F.4th 651; *In re Pom Wonderful LLC Mktg. & Sales Pracs. Litig.*, No. ML 10-02199, 2014 WL 1225184, at *3–4 (C.D. Cal. Mar. 25, 2014) (rejecting "price premium" model that was akin to a "'fraud on the market' theory" because it would assign damages to consumers even if they were not exposed to the alleged misrepresentations).

principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). At deposition, however, Plaintiffs' expert revealed, among other things, that he

- Had not yet conducted any pretesting or determined how he plans to conduct his conjoint survey;

- Had not assessed the demographics or actual purchasing behavior of the putative class;

- Had not yet determined what data he would use to capture different types of sales, or how to match the sales data he had with the specific challenged products and packaging; and

- Had not determined the sensitivity levels he would use for his price-premium model, the initial values he would assign to the variables in any formulas, or what adjustments he would need to make.

Dkt. 124, at 5–7. Nutramax also identified numerous ways in which Dubé had failed to show that the market data necessary for his analysis was even available. *Id.* at 16–17.

Rather than resolve these disputes, the district court

disregarded them, finding that conjoint surveys "are a well-established method for measuring class-wide damages in CLRA mislabeling cases." Pet.App.31. That may be sufficient for Plaintiffs to satisfy *one prong* of Rule 702, but it completely ignores the Rule's other express requirements. There is no way to make the threshold admissibility determination that the expert had "sufficient facts or data," or has "reliably applied the principles and methods to the facts of the case," Fed. R. Evid. 702(b), (d), when the expert has not yet collected the data and has made no attempt to apply his method to the facts of case. Certainly, there is no way to conduct the "rigorous analysis" contemplated in *Olean*—where the district court considered and resolved disputes over the expert's assumptions, inputs, and outputs—when Dubé has not yet generated any assumptions, inputs, or outputs to consider.[5]

---

[5] The district court cited cases suggesting that disputes over the reliability of an expert's methodology go to the weight of the analysis for trial, rather than its admissibility or class certification. Pet.App.5, 11. But Rule 702 *expressly* requires a court to consider whether the expert has "reliably applied the principles and methods to the facts of the case," Fed. R. Evid.

Again, this is not merely an issue of whether Dubé's model may ultimately be persuasive to a jury. As case law reflects, there are any number of ways in which an analysis may reveal variation in the existence of injury across the class, and the unreliability of a classwide model would necessitate individualized inquiries into whether any given class member was in fact harmed. *See Comcast*, 569 U.S. at 34 (explaining that failure of expert's model was a class certification issue because, absent another methodology, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class"); *supra* at 16–17 (collecting cases finding that deficiencies in plaintiffs' model defeated class certification).

To be sure, there will be cases where the existence of classwide injury can be established through common proof without the need for an expert model; in such cases, an expert's damage calculations may not be necessary at the class-certification stage, and it may not be necessary to propose a common damages

---

702(d), and *Olean* requires the same as part of the "rigorous analysis," 31 F.4th at 669.

formula at all. *See, e.g.*, *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (finding no need for a common damages methodology in wage-and-hour case where damages could be determined through reference to payroll records once liability was proved); *cf. Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal.4th 1, 40 (2014) (explaining in class certification context that "'[u]ncertainty of the *fact* whether any damages were sustained is fatal … , but uncertainty as to the *amount* is not'" (citation omitted)). But where, as here, the *fact* of common injury is in dispute, Plaintiffs must meet their burden of presenting evidence that is "admissible and, after rigorous review, … capable of establishing [consumer] impact on a class-wide basis," if the jury ultimately finds it persuasive. *Olean*, 31 F.4th at 678.

Here, Dubé's vague proposal for a to-be-determined conjoint analysis based on to-be-determined evidence—which may or may not be able to show a price premium as to one or more of the statements at issue in the case—falls far short of meeting Plaintiffs' burden. Because the district court failed to hold Plaintiffs to the correct burden and failed to conduct the required

rigorous analysis, this Court should accept review and reverse. *See Stearns*, 655 F.3d at 1018 (district court abuses its discretion by relying on an improper factor, or omitting a factor entitled to substantial weight).

## CONCLUSION

For the foregoing reasons, Nutramax respectfully requests that the Petition for review be granted and that the order certifying the class be reversed.

Dated: May 20, 2022            Respectfully submitted,

SIDLEY AUSTIN LLP

By:/s/ *David R. Carpenter*
David R. Carpenter
Attorney for Defendants-
Petitioners

## CERTIFICATE OF COMPLIANCE

I am the attorney for Petitioners. This brief contains 5,199 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6), as the brief has been prepared in a proportional typeface in 14-point Century Schoolbook font.

I certify that this brief complies with the limit set forth in Circuit Rule 32-3 because the word count divided by 280 does not exceed the 20-page limit designated by Rule 5-2(b).

Dated: May 20, 2022

Respectfully submitted,

SIDLEY AUSTIN LLP

By: /s/ *David R. Carpenter*
David R. Carpenter
Attorney for Defendants-Petitioners

# Appendix



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN LYTLE, <u>et al.</u>, individually and on behalf of all others similarly situated, | Case No. ED CV 19-0835 FMO (SPx) |
| Plaintiffs, | |
| v. | **ORDER RE: MOTION FOR CLASS CERTIFICATION** |
| NUTRAMAX LABORATORIES, INC., <u>et al.</u>, | |
| Defendants. | |

Having reviewed all the briefing filed with respect to plaintiffs' Motion for Class Certification (Dkt. 91, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, <u>see</u> Fed. R. Civ. P. 78(b); Local Rule 7-15; <u>Willis v. Pac. Mar. Ass'n</u>, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

## **BACKGROUND**[1]

Justin Lytle ("Lytle") and Christine Musthaler ("Musthaler") (collectively, "plaintiffs"), on behalf of themselves and all others similarly situated, filed the operative Second Amended Complaint ("SAC") against Nutramax Laboratories, Inc. and Nutramax Laboratories Veterinary

---

[1] Capitalization, quotation and alteration marks, and emphasis in record citations may be altered without notation.

**APP 01**

1 Sciences, Inc. (collectively, "Nutramax" or "defendants") asserting claims for: (1) violations of
2 California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., on behalf
3 of a putative California subclass; and (2) violations of various state consumer protection laws on
4 behalf of a putative national class.  (See Dkt. 53, SAC at ¶¶ 142-169).

5      Defendants research, develop, manufacture, and sell supplements for both humans and
6 household pets, including Cosequin canine joint health supplements that contain glucosamine and
7 chondroitin ("Gl/Ch") as the main active ingredient.  (See Dkt. 53, SAC at ¶¶ 2, 17).  Plaintiffs
8 allege that in marketing Cosequin, defendants "make incomplete and inaccurate claims – both in
9 advertising and on the packaging and packages – that would mislead and have in fact misled
10 reasonable consumers into purchasing, using, and continuing to use [Cosequin] Products."  (Id.
11 at ¶ 1).  According to plaintiffs, defendants' joint health claims "are refuted by peer-reviewed,
12 randomized, controlled clinical trials[.]"  (Id.).  Also, defendants' claims that Cosequin products
13 "enhance joint flexibility and mobility and [] support or restore joint health" are unsupported "by any
14 reliable science."  (Id. at ¶ 5).  If not for defendants' misrepresentations, plaintiffs allege that they
15 and the putative class members either "would not have bought" Cosequin or were charged a "price
16 premium" above comparable generic products.  (Id. at ¶ 123).

17      Lytle purchased Cosequin DS Maximum Strength Plus MSM for his pet dogs from Amazon
18 and Petsmart in California, with his last purchase in February 2019.  (See Dkt. 53, SAC at ¶ 124).
19 Musthaler purchased Cosequin DS Maximum Strength Plus MSM chewable tablets for her pet dog
20 from a Ralph's supermarket, with her last purchase also in February 2019. (Id. at ¶ 126).  Plaintiffs
21 allege that they read the packaging and relied on defendants' representations in purchasing the
22 Cosequin products, and that they would not have done so "had Defendants apprised Plaintiffs that
23 there is no scientifically valid basis for the representations made regarding the products on the
24 packaging[.]"  (Id. at ¶¶ 125, 127-129).  Neither plaintiff "saw improvements in their pets" after
25 giving them Cosequin, and both plaintiffs "are still in possession of unused" Cosequin.  (Id. at ¶
26 128).

27

28

**APP 02**

1    Plaintiffs seek an order certifying the following class pursuant to Rule 23(b)(3) of the

2  Federal Rules of Civil Procedure:[2]

3        [A]ll persons residing in California who purchased during the limitations

4        period the following canine Cosequin products for personal use ("the

5        Products"): Product #1: Cosequin DS Maximum Strength Chewable Tablets[;]

6        Product #2: Cosequin DS Maximum Strength Plus MSM Chewable Tablets[;

7        and] Product #3: Cosequin DS Maximum Strength Plus MSM Soft Chews.

8  (See Dkt. 120, Joint Brief on Class Certification ("Joint Br.") at 2)[3]; (see also Dkt. 91, Motion at 2).

9  Plaintiffs also seek to be appointed class representatives and to have their counsel, Milberg

10  Coleman Bryson Phillips Grossman, PLLC and Levin Papantonio Rafferty, appointed as co-lead

11  class counsel.  (See Dkt. 120, Joint Br. at 20); (Dkt. 145, Declaration of Adam Edwards in Support

12  of Appointment as Co-Lead Class Counsel [] ("Edwards Decl.") at ¶ 5).

13                              **LEGAL STANDARD**

14    Rule 23 permits a plaintiff to sue as a representative of a class if:

15        (1) the class is so numerous that joinder of all members is impracticable;

16        (2) there are questions or law or fact common to the class;

17        (3) the claims or defenses of the representative parties are typical of the

18        claims or defenses of the class; and

19        (4) the representative parties will fairly and adequately protect the interests

20        of the class.

21  Fed. R. Civ. P. 23(a).  Courts refer to these requirements by the following shorthand: "numerosity,

22  commonality, typicality and adequacy of representation[.]"  Mazza v. Am. Honda Motor Co., 666

23  F.3d 581, 588 (9th Cir. 2012).  In addition to fulfilling the four prongs of Rule 23(a), the proposed

24

25  _____

26    [2] All "Rule" references are to the Federal Rules of Civil Procedure unless otherwise indicated.

27    [3] This Order references the unredacted version of the Joint Brief filed under seal, (see, e.g.,
28  Dkt. 120, Joint Br.), although it does not disclose any redacted information.  A publicly-accessible
    version of the Joint Brief containing redactions is available at Dkt. 121.

**APP 03**

1   class must meet at least one of the three requirements listed in Rule 23(b).  See Wal-Mart Stores,
2   Inc. v. Dukes, 564 U.S. 338, 345, 131 S.Ct. 2541, 2548 (2011).

3           "Before it can certify a class, a district court must be satisfied, after a rigorous analysis, that
4   the prerequisites of both Rule 23(a) and" the applicable Rule 23(b) provision have been satisfied.
5   Olean Wholesale Grocery Cooperative, Inc.  v.  Bumble Bee Foods L.L.C., 2022 WL 1053459, *5
6   (9th Cir.  2022) (en banc).  A plaintiff "must prove the facts necessary to carry the burden of
7   establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence."
8   Id.

9           On occasion, the Rule 23 analysis "will entail some overlap with the merits of the plaintiff's
10  underlying claim[,]" and "sometimes it may be necessary for the court to probe behind the
11  pleadings[.]" Dukes, 564 U.S. at 350-51, 131 S.Ct. at 2551 (internal quotation marks omitted).
12  However, courts must remember that "Rule 23 grants courts no license to engage in free-ranging
13  merits inquiries at the certification stage."  Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S.
14  455, 466, 133 S.Ct. 1184, 1194-95 (2013); see id., 133 S.Ct. at 1195 ("Merits questions may be
15  considered to the extent – but only to the extent – that they are relevant to determining whether
16  the Rule 23 prerequisites . . . are satisfied."); Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983
17  n. 8 (9th Cir. 2011) (The court examines the merits of the underlying claim "only inasmuch as it
18  must determine whether common questions exist; not to determine whether class members could
19  actually prevail on the merits of their claims. . . . To hold otherwise would turn class certification
20  into a mini-trial.") (citations omitted).  Finally, a court has "broad discretion to determine whether
21  a class should be certified, and to revisit that certification throughout the legal proceedings before
22  the court." United Steel, Paper & Forestry, Rubber Mfg. Energy, Allied Indus. & Serv. Workers Int'l
23  Union, AFL-CIO, CLC v. ConocoPhillips Co., 593 F.3d 802, 810 (9th Cir. 2010) (internal quotation
24  marks omitted); see also Yokoyama v.  Midland Nat'l Life Ins.  Co., 594 F.3d 1087, 1092 (9th Cir.
25  2010) (The decision to certify a class and "any particular underlying Rule 23 determination
26  involving a discretionary determination" is reviewed for abuse of discretion.).

27

28

APP 04

1
<u>**DISCUSSION**</u>

2
I.      EVIDENTIARY OBJECTIONS

3
        After the close of briefing on the instant Motion, defendants filed motions under Federal

4
Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786

5
(1993), challenging plaintiffs' experts Bruce Silverman ("Silverman") and Dr. Jean Pierre Dubé

6
("Dubé").  (<u>See</u> Dkt. 109, Motion to Exclude the Testimony of Plaintiffs' Expert Witness, Bruce

7
Silverman); (Dkt. 112, Motion to Exclude the Opinions and Testimony of Plaintiffs' Expert Witness,

8
Dr. Jean Pierre Dubé).  Despite defendants' untimely <u>Daubert</u> objections, the court will exercise

9
its discretion to consider their motions.[4]

10
        A court "evaluating challenged expert testimony in support of class certification . . . should

11
evaluate admissibility under the standard set forth in <u>Daubert</u>."  <u>Sali v. Corona Reg'l Med. Ctr.</u>, 909

12
F.3d 996, 1006 (9th Cir. 2018).  "Under <u>Daubert</u>, the trial court must act as a 'gatekeeper' to

13
exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by

14
making a preliminary determination that the expert's testimony is reliable." <u>Ellis</u>, 657 F.3d at 982.

15
At the class certification stage, however, "admissibility must not be dispositive.  Instead, an inquiry

16
into the evidence's ultimate admissibility should go to the weight that evidence is given at th[is ]

17
stage."  <u>Sali</u>, 909 F.3d at 1006.  The court's "analysis [is] tailored to whether an expert's opinion

18
was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as

19
commonality and predominance." <u>Tait v. BSH Home Appliances Corp.</u>, 289 F.R.D. 466, 495 (C.D.

20
Cal. 2012).  In doing so, the "requirements of relevance and reliability set forth in <u>Daubert</u> . . .

21
serve as useful guideposts but the court retains discretion in determining how to test reliability as

22
well as which expert's testimony is both relevant and reliable."  <u>Id.</u> (internal  quotation marks

23
_____

24
        [4]  As explained in the Court's Order Re: Motions for Class Certification (Dkt. 70), "[a]fter the

25
joint brief [on class certification] is filed, each party may file a supplemental memorandum of points
and authorities no later than fourteen (14) days prior to the hearing date. . . .  No other separate

26
memorandum of points and authorities shall be filed by either party in connection with the motion
for class certification."  (<u>Id.</u> at 4).  Here, defendants filed their <u>Daubert</u> motions, (<u>see</u> Dkt. 109,

27
Motion to Exclude the Testimony of Plaintiffs' Expert Witness, Bruce Silverman); (Dkt. 112, Motion
to Exclude the Opinions and Testimony of Plaintiffs' Expert Witness, Dr. Jean Pierre Dubé), two

28
days prior to the hearing date set for plaintiff's motion for class certification.  (<u>See</u> Dkt. 91, Motion).

**APP 05**

1   omitted).  At this stage, the court considers only "if expert evidence is useful in evaluating whether

2   class certification requirements have been met."  Id. (internal quotation marks omitted).

3       A.    <u>Silverman</u>

4       Silverman has 50 years of professional experience in the marketing and communications

5   industry, and has provided expert testimony in many cases involving allegations of false

6   advertising.  (See Dkt. 93-3, Exh. 3, Expert Report of Bruce G. Silverman ("Silverman Report") at

7   ¶¶ 9, 11); see, e.g., <u>Bailey v. Rite Aid Corp.</u>, 338 F.R.D. 390, 400-01 (N.D. Cal. 2021);

8   <u>Krommenhock v. Post Foods, LLC</u>, 334 F.R.D. 552, 579-80 (N.D. Cal. 2020); <u>Hadley v. Kellogg</u>

9   <u>Sales Co.</u>, 324 F.Supp.3d 1084, 1115 (N.D. Cal. 2018); <u>Hobbs v. Brother Int'l Corp.</u>, 2016 WL

10   7647674, *4-5 (C.D. Cal. 2016).  Plaintiffs rely on Silverman's opinion to support their contention

11   that the challenged label claims would be material to a reasonable consumer.  (See Dkt. 120, Joint

12   Br. at 28-30).

13       Defendants raise several objections to Silverman's testimony.  First, defendants argue that

14   Silverman's testimony "purport[s] to get inside the head of Defendants . . . as to their intent in

15   labeling with the challenged claims[.]"  (Dkt. 109-5, Joint Brief on Defendants' Motion to Exclude

16   the Opinions and Testimony of [] Bruce Silverman ("Silverman Joint Br.") at 1); (see also id. at 6-

17   8).  But even if that were true, defendants' intent with respect to the challenged label statements

18   is not an element of plaintiffs' CLRA claim, see infra at § III.A.1., and plaintiffs do not purport to

19   rely on Silverman's testimony for such evidence in support of their motion for class certification.

20   (See, generally, Dkt. 120, Joint Br.).

21       Second, defendants assert that Silverman "failed to save his internet searches and

22   materials viewed online."[5]  (Dkt. 109-5, Silverman Joint Br. at 1); (see also id. at 8-10).

23   _____

24       [5]  Defendants similarly argue that "Silverman omitted from his report 'the facts or data

25   considered' in forming his opinions."  (Dkt. 109, Silverman Joint Br. at 12) (quoting FRCP
26(a)(2)(B)(ii)).  Defendants point to portions of Silverman's deposition in which the full context

26   makes clear that Silverman was explaining that his views are informed by his cumulative
experience in consumer research.  (See Dkt. 109-7, Tab 1, Deposition of Bruce Silverman

27   ("Silverman Depo.") at 63-64) ("[A]s I speak to in my – in the 'Qualifications' section in my report,
. . . I've had access to literally thousands of pieces of consumer research, all of which inform my

28   knowledge and understanding of how consumers interact with products sold in retail."); (id. at 64-

1    Defendants refer to comments Silverman made during his deposition that he probably "looked at
2    the websites from Chewy or other places where these products are sold just to get a different view
3    of the packaging."  (Dkt. 109-7, Tab 1, 109-7, Tab 1, Silverman Depo. at 66).  The court is not
4    persuaded that this is a reason to exclude Silverman's testimony.  Moreover, Silverman explains
5    that his opinions are based on the product labels and packages that defendants provided in
6    discovery.  (See Dkt. 93-3, Exh. 3, Silverman Report at ¶ 57).

7          Defendants also contend that Silverman "was recently excluded in another case for the
8    same issue."  (Dkt. 109-5, Silverman Joint Br. at 9).  In Price, the court excluded Silverman's
9    testimony at summary judgment "[t]o the extent that [he] opines on consumers' awareness of
10   keratin as an ingredient in haircare products and consumers' resulting perception of the
11   Challenged Terms" because that opinion was "not based on his experience, nor [was] it based on
12   a reliable methodology."  2020 WL 4937464, at *4.  The court noted that "Silverman does not claim
13   to have any experience from which he can opine on consumer knowledge of keratin as an
14   ingredient in hair products[,]" and that his opinion on that topic was instead based "on certain
15   Google searches[.]"  Id.

16         Here, Silverman does claim to have experience from which he can opine on how a
17   reasonable consumer would understand the challenged label claims.  (See, generally, Dkt. 93-3,
18   Exh. 3, Silverman Report at ¶¶ 9-32) (describing his qualifications as an advertising expert).  And
19   in Price, the court ultimately relied on Silverman's testimony in concluding that plaintiffs put
20   forward sufficient evidence to survive summary judgment as to whether the challenged label

21   _____

22   65) ("Q. Did you rely on any consumer surveys to form the basis of your opinions?  A. No. Well[,]
23   . . . other than, you know, all of the survey material that I reviewed that informs . . . my opinions.
     Q. . . . You're referring to the survey data that you reviewed in the course of . . . your advertising
24   career, not specific survey data related to this case?  A. That's correct.").  Courts have noted that
     Silverman's opinion is reliable because he "has interviewed thousands of consumers over the
25   course of his career and has observed thousands of focus group sessions[.]"  Bailey, 338 F.R.D.
     at 401; see Price v. L'Oreal USA, Inc., 2020 WL 4937464, *3 (S.D.N.Y. 2020) (noting that
26   Silverman "has reviewed thousands of proprietary quantitative studies providing insights into
     consumers' understanding and beliefs about various brands, products and advertising; personally
27   interviewed more than five thousand consumers; and attended at least 3,500 focus group
     sessions").
28

1   claims were deceptive based on the "reasonable consumer" standard, see Price, 2020 WL

2   4937464, at *10, which is the same purpose for which plaintiffs rely on Silverman's testimony in

3   this case.  (See Dkt. 120, Joint Br. at 28-29).  As for defendants' contention that Silverman's

4   opinion is unreliable because it is based on his experience in the advertising industry, (see Dkt.

5   109-5, Silverman Joint Br. at 6) ("Mr. Silverman purports to rely on nothing more than his

6   experience."), that argument also lacks merit.  See, e.g., Bailey, 338 F.R.D. at 401 (rejecting

7   defendant's argument that Silverman's opinions lack support "because they are based primarily

8   on his work experience in the advertising industry").  As the court explained in Price, "expert

9   reports regarding consumer perception need not be based on scientific surveys, [and] experts may

10  testify based on their own experience."  2020 WL 4937464, at *5; see also id. at *3 ("Mr.

11  Silverman's opinions that are premised on his own experience satisfy the factors set forth in Rule

12  702.").

13      Defendants also assert that Silverman violated Rule 26(a)(2)(B)(v) because his report did

14  not list his recent testimony in Bailey, and he did not identify his role in the case until his

15  deposition.[6]  (See Dkt. 109-5, Silverman Joint Br. at 13).  According to defendants, this omission

16  was "highly prejudicial" because they had not prepared to ask Silverman about the case during

17  his deposition.[7]  (See id.).  However, defendants do not assert that this omission in Silverman's

18  report was the result of bad faith, (see, generally, Dkt. 109-5, Silverman Joint Br. at 12-13), and

19  they did not explore the Bailey case further after Silverman mentioned it during his deposition.

20  (See Dkt. 109-7, Tab 1, Silverman Depo. at 22).  Under the circumstances here, the court declines

21  to take the "extreme measure" of striking an expert witness where there is no evidence of "bad

22  faith or willfulness[.]"  Box v. United States, 2019 WL 6998754, *2 (D. Kan. 2019).

23      Finally, defendants contend that Silverman's opinions "lack any indicia of reliability"

24  because he "did not conduct any surveys, focus groups, or formal research to form the basis of

---

[6]  In Bailey, the court, in granting class certification, relied on Silverman's opinions regarding whether a reasonable consumer was likely to be deceived by label claims.  See 338 F.R.D. at 400.

[7]  To the extent defendants believe they need additional time to depose Silverman about his testimony in Bailey, the court will entertain a motion to reopen discovery for this limited purpose.

1    his materiality opinions." (Dkt. 109-5, Silverman Joint Br. at 16).  However, California courts have

2    "expressly rejected the 'view that a plaintiff must produce a consumer survey or similar extrinsic

3    evidence to prevail on a claim that the public is likely to be misled by a representation.'" Mullins

4    v. Premier Nutrition Corp., 2016 WL 1535057, *5 (N.D. Cal. 2016) (quoting Colgan v. Leatherman

5    Tool Grp., Inc., 135 Cal.App.4th 663, 681 (2006)).  And courts in other false advertising cases

6    have specifically rejected this argument with respect to Silverman's expert testimony as to how

7    a reasonable consumer would understand challenged label claims. See, e.g., Krommenhock, 334

8    F.R.D. at 580 ("Post's argument that Silverman's opinions must be excluded because he did not

9    conduct any focus group or other consumer testing is misplaced. . . .  Also without merit is Post's

10   assertion that Silverman needed to have but had no methodology to support his analysis of

11   meaning and materiality."); Bailey, 338 F.R.D. at 401 (rejecting defendant's argument that

12   "Silverman's opinions have no meaningful support, because they are based primarily on his work

13   experience in the advertising industry, and because he did not conduct a survey of Rite Aid

14   gelcaps consumers"); Hadley, 324 F.Supp.3d at 1115 ("To the extent Kellogg argues that Plaintiff's

15   expert testimony [by Silverman] is weak or that Plaintiff lacks consumer survey evidence, . . . that

16   argument is without merit.").

17         B.    Dubé.

18         Dubé is a professor of marketing at the University of Chicago Booth School of Business,

19   where he has been on the faculty since 2000, and a research fellow at the National Bureau of

20   Economic Research. (See Dkt. 102-1, Exh. 2, Expert Report of Professor Jean-Pierre H. Dubé

21   ("Dubé Report") at ¶¶ 5-6).[8]  He has extensive experience in marketing data and analytics, has

22   taught courses on conjoint analysis and estimating consumer demand, and has published dozens

23   of papers on topics relating to consumer demand for branded goods and business pricing

24   decisions. (See id. at ¶¶ 7-9).  He has testified as an expert in several cases relating to false

25   advertising and the impact of packaging information on pricing and other market outcomes. (See

26   id. at ¶ 11).  Plaintiffs rely on Dubé's proposed model to establish that "damages are capable of

27   _____

28         [8]  A redacted version of Dubé's report is available at Dkt. 101-1.

1  measurement on a classwide basis."  (Dkt. 120, Joint Br. at 36) (quoting Comcast Corp. v.

2  Behrend ("Comcast"), 569 U.S. 27, 34, 133 S.Ct. 1426, 1433 (2013)).

3       Defendants primarily object to Dubé's testimony on the grounds that he has not "performed

4  a damages analysis using actual evidence[,]" (Dkt. 124, Joint Brief on Defendants' Motion to

5  Exclude the Opinions and Testimony of Plaintiffs' Expert Witness, Dr. Jean Pierre Dubé ("Dubé

6  Joint Br.") at 5),[9] and he "lacks critical data needed to complete his analysis."  (Id. at 16).  As

7  explained below, see infra at § III.A.3., "[a] plaintiff is not required to actually execute a proposed

8  conjoint analysis to show that damages are capable of determination on a class-wide basis with

9  common proof" at the class certification stage.  Bailey, 338 F.R.D. at 408 n. 14 (quoting Comcast,

10 569 U.S. at 34, 133 S.Ct. at 1426) (citation and emphasis omitted).

11      Defendants also assert that "[t]he vast majority of putative class members were not

12 exposed to the majority of challenged statements."  (See Dkt. 124, Dubé Joint Br. at 11-12).

13 However, as noted below, all proposed class members saw at least one of the challenged label

14 claims.  See infra at §§ II.B. & II.C.

15      Finally, defendants' contention that Dubé impermissibly uses a fraud-on-the-market model

16 for damages, (see Dkt. 124, Dubé Joint Br. at 12), misapprehends his proposed model.  Dubé

17 proposes a choice-based conjoint analysis to measure the impact of the challenged label claims

18 and other product features on demand for Cosequin.  (See Dkt. 102-1, Dubé Report at ¶¶ 14-18,

19 32-61).  According to Dubé, his analysis will control for the supply-side of the market by controlling

20 "for the marketplace realities of competitors to [Cosequin] with different product features and

21 different prices."  (Id. at ¶ 14).  To be clear, defendants "do[] not appear to dispute 'that conjoint

22 analysis is a well-accepted economic methodology.'"  Hadley, 324 F.Supp.3d at 1107 (quoting In

23 re Dial Complete Mktg. & Sales Pracs. Litig., 320 F.R.D. 326, 331 (D.N.H. 2017)) (collecting

24 cases).  Indeed, "[s]imilar conjoint surveys and analyses have been accepted against Comcast

25 and Daubert challenges by numerous courts in consumer protection cases challenging false or

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

28      [9]  A redacted version of defendants' motion to exclude Dubé's testimony is available at Dkt.
112-5.

**APP 10**

1  misleading labels." Krommenhock, 334 F.R.D. at 575.  At best, defendants' "[c]hallenges to

2  [Dubé's] survey methodology go to the weight given the survey, not its admissibility." Wendt v.

3  Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir. 1997).

4       In short, the court finds that Silverman's and Dubé's expert reports and testimony are

5  admissible to the extent the court relies on them in determining class certification.

6  II.     RULE 23(a) REQUIREMENTS.

7       A.     Numerosity.

8       A putative class may be certified only if it "is so numerous that joinder of all members is

9  impracticable[.]"  Fed. R. Civ. P. 23(a)(1).  Although impracticability does not hinge only on the

10 number of members in the putative class, joinder is usually impracticable if a class is "large in

11 numbers[.]"  See Jordan v. Cty. of Los Angeles, 669 F.2d 1311, 1319 (9th Cir.), vacated on other

12 grounds by Cty. of Los Angeles v. Jordan, 459 U.S. 810 (1982) (class sizes of 39, 64, and 71 are

13 sufficient to satisfy the numerosity requirement).  "As a general matter, courts have found that

14 numerosity is satisfied when class size exceeds 40 members[.]"  Slaven v. BP Am., Inc., 190

15 F.R.D. 649, 654 (C.D. Cal. 2000); see Tait, 289 F.R.D. at 473-74 (same).

16      Here, defendants do not contest numerosity.  (See Dkt. 120, Joint Br. at 11).  Moreover,

17 plaintiffs assert that while "the precise number of class members is unknown[,] . . . 'general

18 knowledge and common sense indicate it is large.'"  (See id.) (quoting Tait, 289 F.R.D. at 474).

19 Having reviewed the evidence submitted in connection with the instant Motion, (see, e.g., Dkt.

20 102-4, Declaration of David M. Moore) (providing Cosequin sales data),[10] the court is satisfied that

21 the proposed class is sufficiently numerous that joinder of all members is impracticable.

22      B.     Commonality.

23      Commonality is satisfied if "there are common questions of law or fact common to the

24 class." Fed. R. Civ. P. 23(a)(2).  It requires plaintiffs to demonstrate that their claims "depend

25 upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the

26 validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; see

27 _____

28      [10]  A redacted version of Moore's declaration is available at Dkt. 101-4.

1   also Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (explaining

2   that the commonality requirement demands that "class members' situations share a common issue

3   of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims

4   for relief") (internal quotation marks omitted).   "The plaintiff must demonstrate the capacity of

5   classwide proceedings to generate common answers to common questions of law or fact that are

6   apt to drive the resolution of the litigation."   Mazza, 666 F.3d at 588 (internal quotation marks

7   omitted).   "This does not, however, mean that every question of law or fact must be common to

8   the class; all that Rule 23(a)(2) requires is a single significant question of law or fact."   Abdullah

9   v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir. 2013) (emphasis and internal quotation

10  marks omitted); see Mazza, 666 F.3d at 589.   Proof of commonality under Rule 23(a) is "less

11  rigorous" than the related preponderance standard under Rule 23(b)(3).   See Mazza, 666 F.3d at

12  589 (characterizing commonality as a "limited burden[,]" stating that it "only requires a single

13  significant question of law or fact[,]" and concluding that it remains a distinct inquiry from the

14  predominance issues raised under Rule 23(b)(3)).   "The existence of shared legal issues with

15  divergent factual predicates is sufficient, as is a common core of salient facts coupled with

16  disparate legal remedies within the class."   Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th

17  Cir. 1998).

18          Plaintiffs contend that the following statements on the subject product labels, which they

19  refer to collectively as the "Joint Health Representations," are false and misleading because the

20  products in question "have no effect on canine joint health":  (1) "Use Cosequin to help your pet

21  Climb stairs, Rise, and Jump!"; (2) "Joint Health Supplement"; (3) "Supports Mobility for a Healthy

22  Lifestyle"; (4) "Mobility, Cartilage and Joint Health Support."  (Dkt. 120, Joint Br. at 1-2) (internal

23  quotation marks omitted).  Under the circumstances here, there are common questions of law and

24  fact, including: (1) whether members of the public are likely to be deceived by the Joint Health

25  Representations; (2) whether defendants communicated the Joint Health Representations; (3) if

26  so, whether the Joint Health Representations were material to a reasonable consumer; and (4)

27  if the representations were material, were they truthful.   These common questions not only

28  address required elements of plaintiffs' CLRA claim, see Stearns v. Ticketmaster Corp., 655 F.3d

1   1013, 1022 (9th Cir. 2011), abrogated on other grounds in Comcast, 569 U.S. 27, 133 S.Ct. 1426,

2   (describing CLRA claims), but they also are susceptible to common proof – for example, testimony

3   by plaintiffs and their experts explaining whether a reasonable consumer is likely to be misled by

4   the contested label claims, as well as the "truth or falsity" of those claims, which will resolve

5   "issue[s] that [are] central to the [claims'] validity[.]"  See Dukes, 564 U.S. at 350, 131 S.Ct. at

6   2551; see, e.g., Johns v. Bayer Corp., 280 F.R.D. 551, 557 (S.D. Cal. 2012) ("[T]he predominating

7   common issues include whether Bayer misrepresented that the Men's Vitamins 'support prostate

8   health' and whether the misrepresentations were likely to deceive a reasonable consumer. . . .

9   [T]hese predominant questions are binary – advertisements were either misleading or not, and

10  Bayer's prostate health claim is either true or false.  Plaintiffs claim each of these predominating

11  common questions is capable of class-wide resolution using class-wide evidence, and will

12  generate common answers to the primary questions presented in this lawsuit."); Yamagata v.

13  Reckitt Benckiser LLC, 2019 WL 3815718, *1 (N.D. Cal. 2019) ("The plaintiffs have submitted

14  evidence that Reckitt Benckiser labeled their 'Move Free' glucosamine and chondroitin-based

15  supplements with claims suggesting that the supplements would improve joint functioning, but that

16  scientific studies show the ingredients in the supplements do not actually improve joint functioning.

17  The plaintiffs have therefore shown that liability is at least susceptible to classwide proof.").

18        Although defendants primarily "address[] why plaintiffs fail to show commonality as part of

19  [their] predominance analysis[,]" (Dkt. 120, Joint Br. at 14), they briefly raise two arguments with

20  respect to the commonality requirement.  First, defendants assert that plaintiffs "fail to cite any

21  competent evidence that their supposed common questions can be resolved on a classwide

22  basis."  (Id.).  As discussed below with respect to the predominance requirement, see infra at §

23  III.A.1., plaintiffs submitted expert reports and other evidence that show that the contested label

24  claims are false and material.  (See, e.g., Dkt. 120, Joint Br. at 13, 23, 28-29).  And aside from

25  defendants' contention that plaintiffs lack common evidence, defendants do not say why the

26  common questions are not "capable of classwide resolution" in "that determination of [their] truth

27  or falsity will resolve an issue that is central to the validity of . . . [plaintiffs'] claims in one stroke."

28  Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; (see, generally, Dkt. 120, Joint Br. at 14).

1   Second, defendants contend that plaintiffs' authorities "are distinguishable as the

2 challenged claims in each appeared on the front label of products[,]" whereas here plaintiffs

3 "challenge labeling claims that appear exclusively on the back" of the products.  (See Dkt. 120,

4 Joint Br. at 14 n. 12) (citing Dkt. 120-2, Exh. 6, Cosequin Label & Ad Images).[11]  As an initial

5 matter, courts have certified similar class actions based on allegedly false advertising that appears

6 on both the front and back labels of consumer products.  See, e.g., Barrera v. Pharmavite, LLC,

7 2016 WL 11758373, *1 (C.D. Cal. 2016) (noting that the plaintiff, "[i]n making her purchase, . . .

8 read the front , back, and sides of the TripleFlex Triple Strength Label and, relied on every single

9 one of Defendant's renewal and rejuvenation representations") (internal quotation marks omitted).

10 Moreover, defendants do not specify which of the contested label claims "appear exclusively on

11 the back" of the products.  (See, generally, Dkt. 120, Joint Br.).  In any event, at least one or more

12 of the contested label claims (e.g., "Joint Health Supplement") appears on the front of each

13 Cosequin product to which defendants refer, and the contested label claims that appear on the

14 back are nonetheless prominent.  (See Dkt. 120-2, Exh. 6, Cosequin Label & Ad Images at ECF

15 3792-3809).  Defendants also do not explain why the presence of certain contested label claims

16 on the back of Cosequin products would defeat or undermine the presence of common questions

17 here, (see, generally, Dkt. 120, Joint Br. at 14), and no reason is apparent to the court.

18   Under the circumstances, the court is satisfied that the commonality requirement has been

19 met here, as there are common questions relating to the likelihood of consumers being deceived

20 by defendants' representations, the materiality of those representations, and their veracity.  See,

21 e.g., Bailey, 338 F.R.D. at 399 (commonality established where plaintiff identified common

22 questions for CLRA claim regarding whether a "rapid release" statement on acetaminophen

23 gelcaps "was likely to deceive a reasonable consumer" and "whether the 'rapid release' statement

24 was material"); Martinelli v. Johnson & Johnson, 2019 WL 1429653, *6 (E.D. Cal. 2019) ("Here,

25 every class member has the same basic claim – they purchased Benecol because of statements

26 on the product's packaging and those statements were false.  Resolution of this common claim

_____

28  [11]  A redacted version of Exhibit 6 is available at Dkt. 121-2.

1  depends on a critical common question of fact: whether Defendants' statements were in fact
2  false.") (citation omitted); <u>McCrary v. Elations Co., LLC</u>, 2014 WL 1779243, *10 (C.D. Cal. 2014)
3  ("Plaintiff has identified legal issues common to the putative class claims, namely whether the
4  claims on Elations' packaging that it contains a 'clinically-proven combination' and/or a 'clinically-
5  proven formula' are material and false.  By definition, class members were exposed to these
6  labeling claims, creating a 'common core of salient facts.'") (citation omitted).  In short, the court
7  finds that plaintiffs have satisfied "their limited burden under Rule 23(a)(2) to show that there are
8  'questions of law or fact common to the class.'"  <u>Mazza</u>, 666 F.3d at 589.

9        C.    <u>Typicality</u>.[12]

10       Typicality requires a showing that "the claims or defenses of the representative parties are
11  typical of the claims or defenses of the class[.]"  Fed. R. Civ. P. 23(a)(3).  The purpose of this
12  requirement "is to assure that the interest of the named representative aligns with the interests of
13  the class."  <u>Wolin</u>, 617 F.3d at 1175 (internal quotation marks omitted).  "The requirement is
14  permissive, such that representative claims are typical if they are reasonably coextensive with
15  those of absent class members; they need not be substantially identical."  <u>Just Film, Inc. v. Buono</u>,
16  847 F.3d 1108, 1116 (9th Cir. 2017) (internal quotation marks omitted).  "The test of typicality is
17  whether other members have the same or similar injury, whether the action is based on conduct
18  which is not unique to the named plaintiffs, and whether other class members have been injured
19  by the same course of conduct."  <u>Wolin</u>, 617 F.3d at 1175 (internal quotation marks omitted).  The
20  typicality requirement is "satisfied when each class member's claim arises from the same course
21  of events, and each class member makes similar legal arguments to prove the defendant's
22  liability."  <u>Stearns</u>, 655 F.3d at 1019 (internal quotation marks omitted).

23       Here, defendants argue that plaintiffs' claims are atypical because they are subject to
24  several unique defenses, although defendants cite little authority to support their contentions.

25

26       [12]  Because the Supreme Court has noted that "[t]he commonality and typicality requirements
27  of Rule 23(a) tend to merge[,]" <u>General Tel. Co. of the SW v. Falcon</u>, 457 U.S. 147, 157 n. 13, 102
    S.Ct. 2364, 2371 n. 13 (1982), the court hereby incorporates the Rule 23(a) commonality
28  discussion set forth above.  <u>See</u> <u>supra</u> at § II.B.

1  (See, generally, Dkt. 120, Joint Br. at 16-19).   First, defendants contend that plaintiffs'

2  "expectations about Cosequin were not based on any representations on the label." (Id. at 17).

3  According to defendants, plaintiffs used the Cosequin products to "cure their elderly dogs' myriad

4  diseases . . . even though the Products are not and were never marketed to treat diseases." (Id.).

5  Defendants also contend that plaintiffs "have not shown that their dogs are typical of the class[,]"

6  because their dogs were in "poor health" and plaintiffs do not "point to the percentage of other

7  gravely ill and elderly dogs treated with Cosequin."[13]  (Id. at 18).   Defendants' contentions are

8  unpersuasive.

9        Plaintiffs testified that they purchased defendants' products because they believed it would

10  improve their dogs' joint health.  For example, Musthaler testified that she "expected it to do what

11  it says it's going to do on the package . . . so it would give [her dog] healthy joints." (Dkt. 93-5,

12  Exh. 5, Deposition of Christine Musthaler at 171).   When defense counsel pressed Musthaler on

13  whether she expected that Cosequin would make her older dog "healthy again[,]" Musthaler

14  explained that she did not and reiterated that she "expect[ed] it to help with [her dog's] joints." (Id.

15  at 172).  Lytle similarly testified that in deciding to buy Cosequin, he "went by the labeling and what

16  it promised to do. . . .   Just relief, joint health for older dogs."  (Dkt. 93-4, Exh. 4, Deposition of

17  Justin Anthony Lytle ("Lytle Depo.") at 53).  Lytle also testified that he did not expect that Cosequin

18  would "treat or cure" his dogs' arthritis.  (Id. at 119).

19        Defendants' argument misapprehends the nature of the alleged injury and misconduct here.

20  Plaintiffs' claim "is about point-of-purchase loss[,]" where they "were allegedly injured when they

21  paid money to purchase" Cosequin products that do not provide joint health benefits.  See Johns,

22  280 F.R.D. at 557; see, e.g., Hadley, 324 F.Supp.3d at 1101 ("Kellogg's [] argument appears to

23  stem from a mistaken assumption that the injury that Plaintiff is seeking to redress in the instant

24  case is physical in nature. . . .  Instead, Plaintiff is seeking to recover for the economic injury

25  caused by Kellogg representing that its foods are healthy.") (cleaned up) (emphasis in original);

26  _____

27       [13]  Defendants also do not point to any scientific data that suggests Cosequin provides joint
     health benefits for some types of dogs, but not for others.  (See, generally, Dkt. 120, Joint Br. at
28  16-17).

1  Chacanaca v. Quaker Oats Co., 752 F.Supp.2d 1111, 1125 (N.D. Cal. 2010) ("[T]he particular

2  harm for which [plaintiffs] seek redress is not health related.  Rather, their claims sound in

3  deception, unfairness and false advertising.").

4         Second, defendants contend that "plaintiffs did not use the product as directed[,]" which

5  "render[ed] them not typical of putative class members who did."  (Dkt. 120, Joint Br. at 18).

6  According to defendants, plaintiffs failed to adhere to "feeding instructions requir[ing] three tablets

7  per day for their dogs for the first 4-6 weeks."  (Id.).  It is true that Lytle testified that he gave his

8  dogs "maybe two or three a day[,]" although he sometimes forgot and only gave them one tablet.

9  (Dkt. 93-4, Exh. 4, Lytle Depo. at 44).  However, defendants cite no evidence that plaintiffs' dogs

10 or, for that matter, any dogs, would have received the benefits set forth in the contested label

11 representations had plaintiffs used the product as directed.  (See, generally, Dkt. 120, Joint Br.

12 at 18).  Nor did defendants provide any evidence that all or most members of the proposed class

13 strictly adhered to defendants' instructions for administering Cosequin.  (See, generally, id.).  In

14 any event, even if Lytle differed from other class members in how often he gave Cosequin to his

15 dogs, that would not negate the showing that, in the context of this false-advertising claim, "other

16 members have the same or similar injury" that "is based on conduct which is not unique to" Lytle.

17 Wolin, 617 F.3d at 1175 (internal quotation marks omitted).  Finally, Musthaler testified that she

18 concluded Cosequin did not work as advertised "a little over a month" after she began giving it to

19 her dogs, (Dkt. 93-5, Exh. 5, Musthaler Depo. at 40), but defendants cite no evidence that she

20 "failed to follow the directions."  (See, generally, Dkt. 120, Joint Br. at 18).

21        Third, defendants repeatedly argue that "plaintiffs cannot be typical of the proposed class

22 because both purchased only one of the three Cosequin products at issue, Cosequin DS

23 Maximum Strength Plus MSM Chewable Tablets, the labeling and packaging for which did not

24 contain three of the four challenged claims."  (Dkt. 120, Joint Br. at 18); (see, e.g., id. at 4) ("[T]he

25 overwhelming majority of proposed Class Members never even saw three of the four contested

26 labeling claims."); (Dkt. 123, Defendants' Supplemental Memorandum in Opposition to Class

27 Certification ("Supp. Opp.") at 2-3) (same)).  However, it appears that at least one of the contested

28 label claims appeared prominently on the label of every Cosequin product purchased by the

1   proposed class.  (See, e.g., Dkt. 120, Joint Br.) (copies of label images with the statement "Joint

2   Health Supplement"); (see also id. at 30) (asserting that plaintiffs "can only challenge the "Joint

3   Health Supplement" claim).  Thus, at least with respect to the "Joint Health Supplement" claim,

4   the proposed class is "defined in such a way as to include only members who were exposed to

5   advertising that is alleged to be materially misleading."[14] Mazza, 666 F.3d at 596; see, e.g., Elkies

6   v. Johnson & Johnson Servs., Inc., 2018 WL 11223465, *8 (C.D. Cal. 2018) ("[T]he record clearly

7   establishes that [defendant's] alleged misrepresentations regarding the clinically proven health

8   benefits of the Products are prominently displayed on all of the Products' packaging, a fact that

9   [defendant] has never contested."); Johns, 280 F.R.D. at 557 (finding typicality based in part on

10  evidence that "the Men's Vitamin packages purchased by Plaintiffs and all class members

11  prominently and repeatedly featured the identical 'supports prostate health' claim[,]" and thus

12  "Plaintiffs and class members [] were all exposed to the same alleged misrepresentations on the

13  packages").

14        As to defendants' argument that plaintiffs are atypical because they purchased only one

15  of the subject Cosequin products, (see Dkt. 120, Joint Br. at 18), defendants do not dispute that

16  the Joint Health Supplement statement, and perhaps other contested label claims, appeared on

17  all three products.  (See, generally, id. at 18-19).  Given that plaintiffs allege that they "and all

18  class members were exposed to the same statement" and "were all injured in the same manner,"

19  see Martin v. Monsanto Co., 2017 WL 1115167, *4 (C.D. Cal. 2017), the court is persuaded that

20  plaintiffs' claims are sufficiently typical of the class claims.  While some class members may have

21  purchased a slightly different type of Cosequin than plaintiffs, that "does not defeat typicality

22  because the alleged misrepresentation was the same as to each type of" Cosequin product

23  purchased by the class.  Id. (internal quotation marks omitted).  In other words, "Plaintiff[s'] claims

24  . . . have nothing to do with the unique characteristics of the various [Cosequin] products; they

25  have to do only with what is allegedly shared by all those products."  Id. (internal quotation marks

26  _____

27       [14]  The court may later exclude evidence concerning the contested label claims viewed by only
     a small percentage of the class, and the court does not rely on that evidence in deciding the
28   instant Motion.

omitted); <u>see</u>, <u>e.g.</u>, <u>Chavez v. Blue Sky Nat. Beverage Co.</u>, 268 F.R.D. 365, 377-78 (N.D. Cal. 2010) (even though "plaintiff did not buy each product in the Blue Sky beverage line[,]" he satisfied typicality because his claims arose "out of the [same] allegedly false statement" on the beverages and "therefore [arose] from the same facts and legal theory"); <u>Johns</u>, 280 F.R.D. at 557 ("Plaintiffs claim typicality is met because they and the proposed class assert exactly the same claim, arising from the same course of conduct – Bayer's marketing campaign.").

Finally, defendants argue that the evidence shows Lytle "believed Cosequin worked and was worth what he paid for it."  (Dkt. 120, Joint Br. at 19).  Specifically, defendants assert that "Lytle continued to use Cosequin after filing [this] lawsuit[,]" citing Lytle's deposition testimony in which it appears he was asked to estimate how long he continued to use the final bottle of Cosequin he purchased.  (<u>Id.</u>); (<u>see</u> Dkt. 93-4, Exh. 4, Lytle Depo. at 78) ("Q. So at minimum, wouldn't you agree the minimum number of days that you continued to give [his dog] Zoey Cosequin after you purchased this bottle, this 250-count bottle in February 2019, is 140? . . . THE WITNESS: Correct.").  Defendants also assert that Lytle "continued to purchase and give Cosequin to his dogs for years" after he believed "it was not helping[,]" (Dkt. 120, Joint Br. at 19), for which they cite the following testimony: "Q. So is it fair to say, then, sometime in 2016 or 2017 is when you came to the conclusion that Cosequin wasn't – wasn't helping with your dogs, giving them relief or better mobility?  A. I can't recall the exact – exactly when, but it's when I started to have my doubts."  (Dkt. 93-4, Exh. 4, Lytle Depo. at 61).

Under the circumstances, the court is not persuaded that Lytle's equivocal statement that he continued buying Cosequin after he "started to have . . . doubts" about its effectiveness renders him atypical.  Moreover, defendants rely on cases in which the plaintiff continued purchasing a product even after the plaintiff knew the challenged claim was false, (<u>see</u> Dkt. 120, Joint Br. at 19), which is not what Lytle said.  For example, in <u>Turcios v. Carma Lab'ys, Inc.</u>, 296 F.R.D. 638 (C.D. Cal. 2014), the plaintiff alleged that the defendant sold "lip balm in packaging that contains a false bottom, deceptive covering, and/or nonfunctional slack fill[,]" and "that he would not have paid the price he paid for it had he known that the entire [] jar was not filled."  <u>Id.</u> at 642.  The <u>Turcios</u> court concluded that the plaintiff's testimony revealed that he did not rely "on the external volume of the

1    jar when he purchased the lip balm[.]"  Id. at 643.  The court explained that the "Plaintiff testified
2    that he had no expectation about how much product he was getting when he first purchased the
3    lip balm . . . , he knew he was getting .25 ounces before he purchased the product, he was
4    satisfied with the product and did not have any concerns or complaints after he finished his first
5    and second .25 ounce jars, he continued to purchase the Carmex .25 ounce jars without reading
6    the information on or inspecting the jar, he had no expectation of how much product he was
7    getting, he did not put any thought into what price was reasonable, and he would still use Carmex
8    today if he needed it."  Id.  Unlike the slack-fill component in Turcios, where the consumer received
9    a small quantity of the subject product, plaintiffs here allege that Cosequin was ineffective for its
10   advertised use as a joint health supplement – i.e., plaintiffs' dogs received no joint health benefit
11   from the subject products.  Moreover, Lytle's testimony that he continued buying Cosequin even
12   though he "started to have . . . doubts" provides defendants with comparably weaker evidence with
13   which to challenge Lytle's reliance on the contested label claims.

14         In short, the court finds that this factor is satisfied because plaintiffs' claims are based on
15   the same facts, that they "relied upon defendants' representations in purchasing Cosequin and
16   expected the Products to be effective as claimed on the packaging[,]" and the same legal and
17   remedial theories as the claims of the rest of the class members.  (Dkt. 53, SAC at ¶ 128); see,
18   e.g., Hilsley v. Ocean Spray Cranberries, Inc., 2018 WL 6300479, *6 (S.D. Cal. 2018) ("Plaintiff
19   has demonstrated that her claims are typical as the Complaint alleges that she and all class
20   members purchased the Products, were deceived by the false and deceptive labeling and lost
21   money as a result."); Lilly v. Jamba Juice Co., 308 F.R.D. 231, 240 (N.D. Cal. 2014) ("Named
22   Plaintiffs . . . clearly have a similar alleged injury as the rest of the proposed class, since they
23   purchased products that are the same as, or very similar to, the products challenged by the rest
24   of the proposed class.  Their claims are not based on any conduct that is unique to them.").  As
25   plaintiffs state, their claims are co-extensive with those of the class because they allege they "were
26   deceived by defendants' mislabeling about the efficacy of Cosequin" and "were harmed in that
27   they paid for a product marketed to improve mobility that was, in reality, no more effective than
28   placebo."  (Dkt. 120, Joint Br. at 15).

1      D.      <u>Adequacy</u>.

2          Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly

3  and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  A two-prong test is

4  used to determine adequacy of representation:  "(1) do the named plaintiffs and their counsel have

5  any conflicts of interest with other class members and (2) will the named plaintiffs and their

6  counsel prosecute the action vigorously on behalf of the class?"  <u>Ellis</u>, 657 F.3d at 985 (internal

7  quotation marks omitted).  "Adequate representation depends on, among other factors, an

8  absence of antagonism between representatives and absentees, and a sharing of interest

9  between representatives and absentees."  <u>Id.</u>  The adequacy of counsel is also considered under

10 Rule 23(g).

11         Here, defendants only challenge Lytle's adequacy to serve as a class representative based

12 on his "criminal history[.]" (Dkt. 120, Joint Br. at 20).  However, defendants rely on inapposite

13 cases, (<u>see</u> <u>id.</u> at 21), in which the plaintiff was involved in criminal activity during the class

14 certification process or had convictions for serious offenses that could be used for impeachment.

15 <u>See</u>, <u>e.g.</u>, <u>Dunford v. Am. DataBank, LLC</u>, 64 F.Supp.3d 1378, 1396-97 (N.D. Cal. 2014) ("The

16 undersigned judge will not leave the rights of absent class members . . . in the hands of someone

17 who was arrested the day before the class certification hearing, convicted of vandalism while class

18 certification was pending, and recently 'entered the wrong apartment . . . while intoxicated' leading

19 to a guilty plea of aggravated trespass, not to mention all the other convictions."); <u>Porath v.</u>

20 <u>Logitech, Inc.</u>, 2019 WL 6134936, *5 (N.D. Cal. 2019) (concluding that a proposed class

21 representative "who has seven criminal convictions, is a convicted felon three times over, has a

22 history of substance abuse, and of not reporting to his probation officer . . . is unacceptable" in part

23 because his felony convictions would be admissible as impeachment evidence under Federal Rule

24 of Evidence 609).  Based on the evidence submitted by defendants, which includes records for

25 speeding tickets from 1995 and 1996, (<u>see</u> Dkt. 93-26, Exh. 26, Lytle Criminal Records at ECF

26 1185, 1189), it does not appear that Lytle has been convicted of a felony or a crime involving a

27 dishonest act or false statement.  (<u>See</u>, <u>generally</u>, <u>id.</u>); (Dkt. 93-27, Exh. 27, Lytle Criminal

28 Records); (Dkt. 93-4, Exh. 4, Lytle Depo. at 131-133)

1    In short, the court finds that neither plaintiffs' counsel nor plaintiffs have any conflicts of

2    interest with class members, and that counsel and plaintiffs have established that they will

3    prosecute the action vigorously on behalf of the class.  (See Dkt. 94, Declaration of Matt Schultz

4    at ¶¶ 3-4);(see, generally, Dkt. 145, Edwards Decl.); (Dkt. 145-1, Exh. A, Milberg Coleman Bryson

5    Phillips Grossman Firm Resume); (Dkt. 145-2, Exh. B, Levin Papantonio Rafferty Firm Resume).

6    III.    RULE 23(b)(3) REQUIREMENTS.

7            Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can

8    be served best by settling their differences in a single action." Hanlon, 150 F.3d at 1022 (internal

9    quotation marks omitted).  Fed. R. Civ. P. 23(b)(3) requires two different inquiries, specifically a

10   determination as to whether:  (1) "questions of law or fact common to class members predominate

11   over any questions affecting only individual members[;]" and (2) "a class action is superior to other

12   available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

13           A.    Predominance.

14           "Though there is substantial overlap between [the Rule 23(a)(2) commonality test and the

15   Rule 23(b)(3) predominance test], the 23(b)(3) test is far more demanding[.]"[15] Wolin, 617 F.3d

16   at 1172 (internal quotation marks omitted).  "The Rule 23(b)(3) predominance inquiry tests whether

17   proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem

18   Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249 (1997).  "This calls upon courts

19   to give careful scrutiny to the relations between common and individual questions in a case."

20   Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453, 136 S.Ct. 1036, 1045 (2016).  "The

21   predominance inquiry asks whether the common, aggregation-enabling, issues in the case are

22   more prevalent or important than the non-common, aggregation-defeating, individual issues.

23   When one or more of the central issues in the action are common to the class and can be said to

24   predominate, the action may be considered proper under Rule 23(b)(3) even though other

25   important matters will have to be tried separately, such as damages or some affirmative defenses

26

27           [15]   Given the substantial overlap between Rule 23(a) and Rule 23(b)(3), and to minimize
     repetitiveness, the court hereby incorporates the Rule 23(a) discussion set forth above. See supra
28   at § II.B.

1   peculiar to some individual class members."  Id. (citations and internal quotation marks omitted);

2   see Wang v. Chinese Daily News, Inc., 737 F.3d 538, 545 (9th Cir. 2013) ("The predominance

3   analysis under Rule 23(b)(3) focuses on the relationship between the common and individual

4   issues in the case and tests whether the proposed classes are sufficiently cohesive to warrant

5   adjudication by representation.") (internal quotation marks omitted); In re Wells Fargo Home

6   Mortg. Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009) ("The focus is on the relationship

7   between the common and individual issues.") (internal quotation marks omitted).  The class

8   members' claims do not need to be identical.  See Local Joint Exec. Bd. of Culinary/Bartender

9   Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir. 2001) (allowing "some

10  variation" between class members); Abdullah, 731 F.3d at 963 (explaining that "there may be

11  some variation among individual plaintiffs' claims") (internal quotation marks omitted).  The focus

12  is on whether the "variation [in the class member's claims] is enough to defeat predominance

13  under Rule 23(b)(3)."  Local Joint Exec. Bd. of Culinary/Bartender Trust Fund, 244 F.3d at 1163;

14  see Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975) ("[C]ourts have taken the common sense

15  approach that the class is united by a common interest in determining whether defendant's course

16  of conduct is in its broad outlines actionable, which is not defeated by slight differences in class

17  members' positions[.]").

18       Where, as here, a plaintiff's claims arise under state law, the court "looks to state law to

19  determine whether the plaintiffs' claims – and [defendant's] affirmative defenses – can yield a

20  common answer that is 'apt to drive the resolution of the litigation.'"  Abdullah, 731 F.3d at 957

21  (quoting Dukes, 564 U.S. at 350, 131 S.Ct. at 2551); Erica P. John Fund, Inc. v. Halliburton Co.,

22  563 U.S. 804, 809, 131 S.Ct. 2179, 2184 (2011) ("Considering whether questions of law or fact

23  common to class members predominate begins . . . with the elements of the underlying cause of

24  action.") (internal quotation marks omitted).

25

26

27

28

**APP 23**

1         **1.**     **The CLRA**.

2         "The CLRA 'shall be liberally construed and applied to promote its underlying purposes,

3 which are to protect consumers against unfair and deceptive business practices and to provide

4 efficient and economical procedures to secure such protection.'" Nguyen v. Nissan N. Am., Inc.,

5 932 F.3d 811, 817-18 (9th Cir. 2019) (quoting Cal. Civ. Code § 1760).  To establish a CLRA claim,

6 the plaintiff must show that:  (1) the defendant's conduct was deceptive; and (2) the deception

7 caused plaintiff harm.  See Stearns, 655 F.3d at 1022; In re Vioxx Class Cases, 180 Cal.App.4th

8 116, 129 (2009) (same).  In the class context, a CLRA claim "requires each class member to have

9 an actual injury caused by the unlawful practice."  Stearns, 655 F.3d at 1022; Edwards v. Ford

10 Motor Co., 603 F.Appx. 538, 541 (9th Cir. 2015).

11         California courts often find predominance satisfied in CLRA cases because "causation, on

12 a classwide basis, may be established by materiality[,]" meaning that "[i]f the trial court finds that

13 material misrepresentations have been made to the entire class, an inference of reliance arises

14 as to the class."  Stearns, 655 F.3d at 1022 (cleaned up); see Tait, 289 F.R.D. at 480 (same); In

15 re Vioxx Class Cases, 180 Cal.App.4th at 129 (same).  A misrepresentation is material if "a

16 reasonable [person] would attach importance to its existence or nonexistence in determining his

17 choice of action in the transaction in question[.]"  Stearns, 655 F.3d at 1022 (internal quotation

18 marks omitted); see Williams v. Gerber Prod. Co., 552 F.3d 934, 938 (9th Cir. 2008) (CLRA claims

19 are "governed by the reasonable consumer test[,]" under which plaintiffs "must show that members

20 of the public are likely to be deceived") (internal quotation marks omitted).   "If the

21 misrepresentation . . . is not material as to all class members, the issue of reliance would vary

22 from consumer to consumer and the class should not be certified."  Stearns, 655 F.3d at 1022-23

23 (internal quotation marks omitted); see In re Vioxx Class Cases, 180 Cal.App.4th at 129 (same).

24 However, "a plaintiff is not required to show that the challenged statement is the 'sole or even the

25 decisive cause' influencing the class members' decisions to buy the challenged products."  Bailey,

26 338 F.R.D. at 403 (quoting Kwikset Corp. v. Superior Ct., 51 Cal.4th 310, 327 (2011)).

27         Here, both prongs of plaintiffs' CLRA claim present predominant questions.  First, plaintiffs

28 intend to prove defendants' deceptive conduct through expert testimony addressing the evidence

1  base for the contested label claims.  (See Dkt. 120, Joint Br. at 22-24).  Dr. Steven Budsberg

2  opines that "[t]here is no valid and reliable medical or scientific evidence demonstrating the

3  effectiveness of Cosequin with respect to" the challenged label claims, (Dkt. 120-1, Exh. 1, Expert

4  Report of Steven C. Budsberg [] at 19),[16] or that "demonstrat[es] the effectiveness of Cosequin in

5  supporting, maintaining, or improving canine joint health (including improvements in inactivity, joint

6  flexibility, or mobility)" more broadly.  (Id. at 15); (see Dkt. 120, Joint Br. at 23-24).  Dr. Richard

7  Evans ("Evans") similarly opines that there is "no evidence that [Gl/Ch] has a greater prophylactic

8  effect than placebo control on maintaining joint health in healthy pet dogs[,]" (Dkt. 93-12, Exh. 12,

9  Report of Richard Evans, Ph.D. at 5), and that studies purporting to show that Gl/Ch has "a

10  beneficial effect . . . for pet dogs" lack credibility due to various methodological shortcomings.  (Id.

11  at 7); (see Joint Br. 23-24) (noting that Evans "opined on the design and validity of the key

12  scientific key studies" relating to the joint health claims).  Based on the foregoing, it may be shown

13  that defendants' label claims are deceptive, i.e., this inquiry predominates over any individualized

14  issues that arise in connection with the labels themselves.  See, e.g., Barrera, 2016 WL 11758373,

15  at *1 (declining to decertify class where plaintiff had alleged that defendant's "TripleFlex line of

16  products . . .  consistently conveyed the message that the products will improve joint health[,]" and

17  "that credible scientific evidence demonstrates that these active ingredients do not confer any joint

18  health benefits").

19      Second, because causation may be established by materiality, see, e.g., Tait, 289 F.R.D.

20  at 479, plaintiffs point to common evidence that could resolve the question of whether a

21  reasonable consumer is likely to be deceived by the subject label claims.  Plaintiffs intend to show

22  materiality through evidence that class members were uniformly exposed to the contested label

23  claims on the subject Cosequin products, (see Dkt. 120, Joint Br. at 12-13, 27), the opinions of

24  their advertising expert, (see id. at 28-29), defendants' market research regarding Cosequin, (see

25  id. at 28) (under seal), and the testimony of one of defendants' expert.  (See id. at 29).  Plaintiffs'

26  conjoint analysis, discussed further in the damages section, could also support materiality.  See,

27

28      [16]  A redacted version of Budsberg's report is available at Dkt. 121-1.

1   e.g., Bailey, 338 F.R.D. at 403 (noting that plaintiff's conjoint analysis supporting damages would

2   "serve as an indicia of materiality").

3        As to whether class members were exposed to the contested label claims, it appears that

4   the class members were exposed to the statement "Joint Health Supplement" on all relevant

5   Cosequin products and that this statement was visible before purchase.[17]  The court can therefore

6   "infer class-wide exposure to the allegedly misleading conduct at issue."  Bailey, 338 F.R.D. at

7   400; see Ehret v. Uber Techs., Inc., 148 F.Supp.3d 884, 895 (N.D. Cal. 2015) ("[I]n numerous

8   cases involving claims of false-advertising, class-wide exposure has been inferred because the

9   alleged misrepresentation is on the packaging of the item being sold.  In such a case, given the

10  inherently high likelihood that in the process of buying the product, the consumer would have seen

11  the misleading statement on the product and thus been exposed to it, exposure on a classwide

12  basis may be deemed sufficient.").

13       Expert testimony can also establish materiality.  See, e.g., Krommenhock, 334 F.R.D. at

14  563 (noting that plaintiffs rely on the opinions of the same advertising expert used in the case to

15  show that common issues predominate); see also Olean Wholesale Grocery Cooperative, Inc.,

16  2022 WL 1053459, at *11 n. 16 ("[T]he persuasiveness of [an expert's] analysis is not at issue at

17  this phase of the proceeding.").  Silverman, plaintiffs' advertising expert, opines that the subject

18  label claims, including "Joint Health Supplement," "convey the message [to consumers] that

19  defendants' products will work, i.e., help alleviate joint health issues[,]" (Dkt. 93-3, Exh. 3,

20  Silverman Report at ¶ 54), that the claims would be material to a reasonable consumer, (id. at ¶¶

21

22      [17]  As noted above, see supra at §§ II.B. & II.C., defendants assert that three of the four

23  contested label claims appeared on only a small percentage of products, as measured by sales,
    which they also cite in support of their argument that "individual issues predominate and prevent

24  commonality due to diverse labels."  (See, e.g., Dkt. 120, Joint Br. at 30).  Defendants also assert
    that there were dozens of "different label versions during the proposed class period."  (Id.).

25  However, it appears that the contested label claim, "Joint Health Supplement," appeared
    prominently on each of the products purchased by the proposed class, and a review of the labels

26  indicates that the statement was featured consistently across different label designs.  (See, e.g.,
    Dkt. 120-2, Exh. 6, Cosequin Label & Ad Images); see also Kwikset Corp., 51 Cal.4th at 327 ("[A]

27  plaintiff is not required to allege that the challenged misrepresentations were the sole or even the

28  decisive cause of the injury-producing conduct.") (cleaned up).

54, 59), and that "[i]f Plaintiffs are correct in their assertion that the contested label claims are not backed up by scientific evidence, or worse, contradicted by reliable scientific evidence, then . . . consumers would not want to pay" higher prices for Cosequin products, "or for that matter, buy them at all."  (Id. at ¶ 71); (see Dkt. 120, Joint Br. at 28-29); see, e.g., Bailey, 338 F.R.D. at 400 (finding common evidence that a reasonable consumer was likely to be deceived based in part on Silverman's testimony regarding materiality).  Plaintiffs also point to testimony by defendants' expert, Dr. Carol Scott ("Scott"), indicating that "the most important purchase driver for purchasing joint supplements is the desire to improve a dog's mobility and flexibility."  (Id. at 29) (quoting Dkt. 93-15, Exh. 15, Deposition of Carol Scott, Ph.D. at 101) (emphasis omitted); see, e.g., Mullins, 2016 WL 1535057, at *5 (noting that defendants "own marketing research and surveys tend to show that numerous consumers cite joint pain, stiffness, and function as the reasons behind their purchase" of a product with contested label claims concerning joint health).

Defendants assert that "even if the challenged statements were facially uniform," the court must deny class certification if "consumers' understanding of those representations would not be.'" (Dkt. 120, Joint Br. at 22) (alterations omitted) (quoting Jones v. ConAgra Foods, Inc., 2014 WL 2702726, *14 (N.D. Cal. 2014)).[18] However, defendants "point[] to no controlling authority showing that a plaintiff must establish at the class certification stage that consumers have a uniform interpretation of the term that gives rise to the alleged deception[,]" and "[c]ourts . . . routinely hold to the contrary."[19]  Bailey, 338 F.R.D. at 402 n. 12; see, e.g., Fitzhenry-Russell v. Dr. Pepper

_____

[18] Defendants' reliance on Jones is unpersuasive, as the court in that case was specifically referring to the absence of a "fixed meaning for the word 'natural[,]'" 2014 WL 2702726, at *14, which is a more capacious label claim than the joint health representations here.  See Kumar v. Salov N. Am. Corp., 2016 WL 3844334, *9 (N.D. Cal. 2016) (distinguishing Jones because "the label phrase at issue there, 'natural,' . . . is inherently ambiguous."); Mullins, 2016 WL 1535057, at *5 (distinguishing Jones and concluding that "[w]hether an ordinary consumer reasonably believes Premier advertises Joint Juice as a way to improve joint health is amenable to common proof: reviewing the advertisements, labels, and then asking the jury how they understand the message").

[19] Defendants also argue that "[t]he only record evidence . . . shows most consumers do not interpret the labels as promising to treat joint disease." (Dkt. 120, Joint Br. at 25).  In making that argument, however, defendants narrowly characterize plaintiffs' theory regarding why the contested label claims are misleading.  Plaintiffs contend that the contested label claims are

1   Snapple Grp., Inc., 326 F.R.D. 592, 613 (N.D. Cal. 2018) (noting that the "alleged
2   misrepresentations were made . . . to the entire class" and that "the standard requires only that
3   the Court find there is a probability that reasonable consumers could be misled, not that they all
4   believed 'Made From Real Ginger' means the same thing"); Elkins, 2018 WL 11223465, at *4
5   ("[A]s to the CLRA claim, the law appears to be that class members do not have to have a uniform
6   understanding of the meaning behind the challenged representation.") (emphasis in original).

7       Defendants repeatedly argue that plaintiffs cannot establish predominance without offering
8   consumer survey data.  (See, e.g., Dkt. 120, Joint Br. at 26) ("Plaintiffs dispute [defendants']
9   survey findings, but offer no other survey evidence."); (id. at 33) ("Plaintiffs did not conduct a
10  materiality survey, or provide any other reliable evidence, to determine whether consumers relied
11  on particular challenged label statements when making purchase decisions.").  As noted earlier,
12  California courts have "expressly rejected the 'view that a plaintiff must produce a consumer
13  survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a
14  representation.'" Mullins, 2016 WL 1535057, at *5 (quoting Colgan, 135 Cal.App.4th at 681); see,
15  e.g., Krommenhock, 334 F.R.D. at 565 (same); Bailey, 338 F.R.D. at 401 ("[A]n expert who offers
16  testimony on the question of whether a reasonable consumer is likely to be deceived by an
17  allegedly misleading statement, or whether a reasonable consumer would find such a statement
18  to be material, is not required to conduct a consumer survey if his or her testimony is otherwise
19  reliable."); Hadley, 324 F.Supp.3d at 1115 ("To the extent Kellogg argues that Plaintiff's expert
20  testimony is weak or that Plaintiff lacks consumer survey evidence, . . . that argument is without
21  merit.").  In other words, "the lack of extrinsic evidence of reliance does not automatically prevent
22  class certification." Mullins, 2016 WL 1535057, at *5; see, e.g., Johns, 280 F.R.D. at 558 (noting,
23  in response to defendant's argument in mislabeling case that "people buy multivitamins for various
24  reasons," that "California's consumer protection laws evaluate materiality under a reasonable
25  person standard, not on an individualized basis").

26

27  _____

28  deceptive because Cosequin has no effect on joint health, (see, e.g., id. at 22), not that the labels
    falsely "promis[e] to treat joint disease."  (See id. at 25).

1    In any event, "even if [defendants are] correct in [their] assertion that Plaintiff[s] ha[ve] failed

2 to provide sufficient evidence of deception and materiality, that failure has no bearing on whether

3 common questions will predominate over individual questions in the instant case." Hadley, 324

4 F.Supp.3d at 1115.  As noted above, questions as to whether the contested label claims "were

5 misleading and material must be evaluated according to an objective 'reasonable consumer'

6 standard." Id.  "This objective test renders claims under the [] CLRA ideal for class certification

7 because they will not require the court to investigate class members' individual interaction with the

8 product." Tait, 289 F.R.D. at 480 (internal quotation marks omitted).  "As a result, there is no risk

9 whatever that a failure of proof on the common questions of deception and materiality will result

10 in individual questions predominating.  Instead, the failure of proof on the elements of deception

11 and materiality would end the case for one and for all; no claim would remain in which individual

12 issues could potentially predominate."[20] Hadley, 324 F.Supp.3d at 1115-16 (cleaned up); see

13 Amgen, 568 U.S. at 460, 133 S.Ct. at 1191 ("[A] failure of proof on the issue of materiality would

14

15 _____

16    [20] For this reason, the court is unpersuaded that defendants' expert reports by Scott, (see Dkt.
122, Exh. 17, Dr. Carol A. Scott, PhD. Expert Report), and Dr. Olivier Toubia ("Toubia"), (see Dkt.
17 122-1, January 19, 2021, Expert Report of Olivier Toubia, Ph.D. ("January 2021, Toubia Report"));
(Dkt. 122-2, Exh. 18, February 26, 2021, Expert Report of Olivier Toubia, Ph.D.), show that there
18 are "individual issues that predominate and prevent commonality." (Dkt. 120, Joint Br. at 33).  In
addition, a review of defendants' expert reports reveals flaws that undercut their persuasiveness.
19 For example, Toubia designed a survey to answer "whether the challenged claims on Cosequin's
product packaging materially influence consumers' intent to purchase the product." (Dkt. 122-1,
20 Exh. 18, January 2021, Toubia Report at 3-4).  To answer this question, he showed survey
respondents different images of Cosequin product packaging, with half of the respondents shown
21 images that were "modified to only remove the challenged claims."  (Id. at 5).  However, the
modified images still included the "Joint Health Supplement" statement prominently displayed on
22 the front of the label, (see id. at 6), which is the contested label claim that appeared on all of the
products purchased by the proposed class. (See, e.g., Dkt. 120, Joint Br. at 2); (see also Dkt. 53,
23 SAC at ¶ 37) (identifying "Joint Health Supplement" as a challenged representation).  Toubia
instead removed the phrase "Joint Health Support" that appeared in smaller font on the labels,
24 (see Dkt. 122-1, January 2021, Toubia Report at 6), and which plaintiffs do not specifically
challenge in seeking class certification. (See Dkt. 120, Joint Br. at 2).  In short, defendants' expert
25 reports are "outweighed by the common evidence" presented by plaintiffs, "which supports the
proposition that the question of whether a reasonable consumer was likely to be deceived by
26 [defendants'] alleged misleading conduct can be resolved with common proof."  See Bailey, 338
F.R.D. at 402-03 (emphasis omitted).
27

28

1    end the case, given that materiality is an essential element of the class members' securities-fraud

2    claims.").

3         In short, the court finds that plaintiffs have met their burden of showing that common

4    questions of fact and law predominate over individual questions with respect to their CLRA claim.

5         **2.**      **Damages**.

6         Under Comcast, "plaintiffs must be able to show that their damages stemmed from the

7    defendant's actions that created the legal liability." Pulaski & Middleman, LLC v. Google, Inc., 802

8    F.3d 979, 987-88 (9th Cir. 2015)  (internal quotation marks omitted); see Just Film, Inc., 847 F.3d

9    at 1120 (same).  "To satisfy this requirement, plaintiffs must show that 'damages are capable of

10    measurement on a classwide basis,' in the sense that the whole class suffered damages traceable

11    to the same injurious course of conduct underlying the plaintiffs' legal theory." Just Film, Inc., 847

12    F.3d at 1120 (quoting Comcast, 569 U.S. at 34, 133 S.Ct. at 1433).  Although plaintiffs must

13    present the likely method for determining class damages, "it is not necessary to show that [this]

14    method will work with certainty at this time." Chavez, 268 F.R.D. at 379.  Further, "the presence

15    of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva

16    v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013).  In other words, "the fact that the amount

17    of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of

18    ascertainment does not bar recovery."  Pulaski, 802 F.3d at 989 (internal quotation marks

19    omitted); see also Comcast, 569 U.S. at 35, 133 S.Ct. at 1433 (noting that damages "[c]alculations

20    need not be exact" at the class-certification stage); Olean Wholesale Grocery Cooperative, Inc.,

21    2022 WL 1053459, at *9 ("[A] district court is not precluded from certifying a class even if plaintiffs

22    may have to prove individualized damages at trial, a conclusion implicitly based on the

23    determination that such individualized issues do not predominate over common ones.").

24         As an initial matter, it should be noted that "class wide damages calculations under the

25    CLRA are particularly forgiving[,]" because "California law requires only that some reasonable

26    basis of computation of damages be used, and the damages may be computed even if the result

27    reached is an approximation." Nguyen, 932 F.3d at 818 (cleaned up).  Here, plaintiffs contend that

28    the subject label claims "were misleading or deceptive to a reasonable consumer[,]" and that

**APP 30**

1   "class members paid a price premium for the [Cosequin] Products as a result of the deceptive

2   terms included on the label" of Cosequin products. (Dkt. 120, Joint Br. at 37); <u>see</u>, <u>e.g.</u>, <u>McMorrow</u>

3   <u>v. Mondelez Int'l, Inc.</u>, 2021 WL 859137, *6 (S.D. Cal. 2021) ("Plaintiffs' action is a classic

4   mislabeling case, and their allegation is that the defendant's mislabeling of the Products caused

5   Plaintiffs and the putative class members to pay more than they would have if the Products were

6   properly labeled.").  As a method for measuring class-wide damages, plaintiffs point to Dubé's

7   proposed "choice-based conjoint analysis[,]" which "will determine the value consumers place on

8   the challenged terms when purchasing these products," and "in turn permit[] him to calculate the

9   price premium attributable to the challenged terms and the resulting classwide damages." (Dkt.

10  120, Joint Br. at 37).  According to plaintiffs, "Dubé's proposed model will account for both demand

11  and supply-side factors, and the calculation will not require individualized inquiry." (<u>Id.</u>); (<u>see</u> Dkt.

12  102-1, Exh. 2, Dubé Report at ¶ 14).

13      Conjoint surveys, like the one proposed by plaintiffs' expert, are a well-established method

14  for measuring class-wide damages in CLRA mislabeling cases.  <u>See</u>, <u>e.g.</u>, <u>Bailey</u>, 338 F.R.D. at

15  409 ("In mislabeling cases where the injury suffered by consumers was in the form of an

16  overpayment resulting from the alleged misrepresentation at issue, . . . courts routinely hold that

17  choice-based conjoint models that are designed to measure the amount of overpayment satisfy

18  <u>Comcast</u>'s requirements."); <u>Hadley</u>, 324 F.Supp.3d at 1104, 1110 (noting that "[i]t is

19  well-established that the 'price premium attributable to' an alleged misrepresentation on product

20  labeling or packaging is a valid measure of damages in a mislabeling case under the [] CLRA,"

21  and that "conjoint analysis is widely-accepted as a reliable economic tool for isolating price

22  premia") (quoting <u>Brazil v. Dole Packaged Foods, LLC</u>, 660 F.Appx. 531, 534 (9th Cir. 2016);

23  <u>Briseno v. ConAgra Foods, Inc.</u>, 674 F.Appx. 654, 657 (9th Cir. 2017) (recognizing that a "conjoint

24  analysis to segregate the portion of th[e] premium attributable to" a contested label claim was a

25  "well-established damages model[]"); <u>Krommenhock</u>, 334 F.R.D. at 575 ("[C]onjoint surveys and

26  analyses have been accepted against <u>Comcast</u> and <u>Daubert</u> challenges by numerous courts in

27  consumer protection cases challenging false or misleading labels."); <u>McMorrow</u>, 2021 WL 859137,

28  at *14 (finding that the plaintiff's proposed conjoint survey, which would "isolate and measure the

**APP 31**

1   price premium attached only to the term 'nutritious,'" satisfied <u>Comcast</u>).  Courts have also found

2   that conjoint analyses specifically designed by Dubé, and similar to what he proposes here, satisfy

3   <u>Comcast</u>.  <u>See</u>, <u>e.g.</u>, <u>Price v. L'Oreal USA, Inc.</u>, 2018 WL 3869896, *3 (S.D.N.Y. 2018) ("Plaintiffs'

4   proposed model for computing class-wide damages, Dr. Dubé's Conjoint Analysis, is reliable and

5   consistent with their price premium theory of damages."); <u>Goldemberg v. Johnson & Johnson</u>

6   <u>Consumer Companies, Inc.</u>, 317 F.R.D. 374, 394 (S.D.N.Y. 2016) (finding that Dubé's proposed

7   price premium damages model easily satisfied <u>Comcast</u>'s requirements).

8        Defendants contend that Dubé's damages model is "defective" because "[t]he evidence .

9   . . shows the number of uninjured Class Members likely constitutes a significant majority of the

10  class."  (Dkt. 120, Joint Br. at 38-39); (<u>see id.</u> at 40) ("The class cannot be certified because it

11  includes a non-<u>de</u> <u>minimis</u> number of uninjured class members."); (Dkt. 123, Supp. Opp. at 2).

12  Specifically, defendants contend that their expert's survey data and analysis of online Cosequin

13  product reviews show that "the majority of Cosequin purchasers are satisfied with their purchase."

14  (Dkt. 120, Joint Br. at 39); (<u>see id.</u> at 42) ("[T]he overwhelming majority of potential Class

15  Members do not think that they have been injured because they are satisfied with their

16  purchase.").  Defendants similarly contend that "a high proportion of uninjured potential Class

17  Members lack standing."  (<u>Id.</u>).  Defendants' contentions are unpersuasive.

18       As an initial matter, the Ninth Circuit recently rejected the "argument that Rule 23 does not

19  permit the certification of a class that potentially includes more than a de minimis number of

20  uninjured class members." <u>Olean Wholesale Grocery Cooperative, Inc.</u>, 2022 WL 1053459, at *9.

21  Further, defendants cite no authority supporting the proposition that plaintiffs' proposed model is

22  incapable of measuring damages on a class-wide basis.  (<u>See</u>, <u>generally</u>, Dkt. 120, Joint Br. at 38-

23  42).  More to the point, defendants' arguments misapprehend the alleged injury in this case, which

24  is that class members were deceived into buying Cosequin based on misleading label claims,

25  including the "Joint Health Supplement" that appeared on all Cosequin products purchased by the

26

27

28

1  putative class.[21]  See, e.g., Mullins, 2016 WL 1535057, at *7 ("[Defendant's] advertising messages

2  are the focus of the claims, not customer satisfaction, and therefore consumer satisfaction is

3  irrelevant. . . .  There is [] no need to examine whether consumers were satisfied with the product

4  to find an injury."); Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523, 536 (N.D. Cal. 2012)

5  (finding that because "[a]ll of the proposed class members would have purchased the product

6  bearing the alleged misrepresentations[,]" they had a "concrete injury under [California consumer

7  protection laws] sufficient to establish Article III standing") (internal quotation marks omitted).

8          In short, the court is satisfied that plaintiffs have sufficiently shown that their proposed

9  damages model is consistent with their theory of liability under Comcast.  See, e.g., Bailey, 338

10  F.R.D. at 409 (Plaintiffs' proposed choice-based conjoint survey "seeks to measure the premium

11  that consumers paid, on average, as a result of the allegedly misleading conduct at issue and is

12  therefore directly tied to the theory of liability in the case.").

13          B.      Superiority.

14          "[T]he purpose of the superiority requirement is to assure that the class action is the most

15  efficient and effective means of resolving the controversy."  Wolin, 617 F.3d at 1175 (internal

16  quotation marks omitted).  To determine superiority, the court must look at

17                  (A) the class members' interests in individually controlling the prosecution or

18                  defense of separate actions;

19                  (B) the extent and nature of any litigation concerning the controversy already

20                  begun by or against class members;

21

22

23  ─────────────────

24      [21]  To the extent defendants contend that plaintiffs' damages model cannot satisfy Comcast
    "because they have not run their damages models[,]" (Dkt. 120, Joint Br. at 39), defendants'
25  argument is unfounded.  "A plaintiff is not required to actually execute a proposed conjoint analysis
    to show that damages are capable of determination on a class-wide basis with common proof. .
26  . . A plaintiff need only show that 'damages are capable of measurement' on a class-wide basis."
    Bailey, 338 F.R.D. at 408 n. 14 (quoting Comcast, 569 U.S. at 34, 133 S.Ct. at 1426) (citation and
27  emphasis omitted); see  Chavez, 268 F.R.D. at 379 (Plaintiffs "must present a likely method for
    determining class damages," but "it is not necessary to show that his method will work with
28  certainty at this time.") (internal quotation marks omitted).

1            (C) the desirability or undesirability of concentrating the litigation of the claims

2                 in the particular forum; and

3            (D) the likely difficulties in managing a class action.

4 Fed. R. Civ. P. 23(b)(3).

5       Courts considering similar cases routinely find that the class action device is superior to

6 other forms of adjudication.[22] See, e.g., Fitzhenry-Russell, 326 F.R.D. at 616 ("[A] class action is

7 superior because in the absence of a class action, no individual plaintiff would file suit because

8 the amounts at issue for each class member would likely be a few dollars.").  If the court did not

9 certify the proposed class, each plaintiff would have to litigate defendants' liability separately even

10 though it could be established by common evidence using the objective reasonable consumer

11 standard.  However, because each class member's claim involves a relatively small sum of

12 money, there is no doubt that litigation costs would render individual prosecution of such claims

13 prohibitive.  See, e.g., Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (noting

14 that "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual

15 suits" because of litigation costs) (emphasis in original); Valentino v. Carter-Wallace, Inc., 97 F.3d

16 1227, 1234-35 (9th Cir. 1996) ("A class action is the superior method for managing litigation if no

17 realistic alternative exists."); see also Amchem Prods., Inc., 521 U.S. at 617, 117 S.Ct. at 2246

18 ("While the text of Rule 23(b)(3) does not exclude from certification cases in which individual

19 damages run high, the Advisory Committee had dominantly in mind vindication of the rights of

20 groups of people who individually would be without effective strength to bring their opponents into

21 court at all.") (internal quotation marks omitted).

22        Finally, defendants did not identify any manageability issues that preclude establishing

23 superiority.[23]  (See, generally, Dkt. 120, Joint Br. at 45-47); (Dkt. 123, Supp. Opp. at 8-10); cf. 2

24 ——————————————

25     [22] Defendants have not identified or proposed a superior adjudication method.  (See, generally, Dkt. 120, Joint Br.); (Dkt. 123, Supp. Opp.).

26     [23] Although defendants maintain that they are "not arguing lack of ascertainability[,]" they argue

27 that plaintiffs cannot establish superiority because there is no evidence as to "the names of any putative class members (aside from Plaintiffs themselves)[,]" "how many of each of the challenged

28 products each putative class member purchased (aside from Plaintiffs)[,]" and other information

1   Newberg on Class Actions § 4:73 (5th ed.) ("Two primary issues recur in courts' consideration of

2   the manageability of a proposed class action lawsuit – concern that a case will devolve into myriad

3   individual cases because of the salience of individual issues (i.e., that predominance is lacking)

4   and concern that a multi-state class will provoke complicated conflict of law questions rendering

5   management of a single trial impossible.").   The court previously addressed defendants'

6   contentions that there are "individualized questions [that] bear on the required elements of

7   plaintiffs' claims[,]" (see Dkt. 123, Supp. Opp. at 9), including whether "putative class members

8   interpreted the challenged statements in the same way as Plaintiffs."  (Id.); see supra at § III.A.

9   Similarly, the court previously addressed defendants' assertion that "the majority of the class [was]

10   never [] exposed to the majority of the challenged claims," explaining that at least one of the

11   challenged claims did appear on all of the subject products.  See supra at §§ II.B. & II.C.  In short,

12   the court finds that "a class action is superior to other available methods for fairly and efficiently

13   adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

14   **CONCLUSION**

15       Based on the foregoing, IT IS ORDERED THAT:

16       1.  Plaintiffs' Motion for Class Certification **(Document No. 91)** is **granted** as set forth

17   above.  The court certifies the following class pursuant to Rule 23(b)(3) with respect to plaintiffs'

18   claim under the CLRA:

19           All persons residing in California who purchased during the limitations period

20           the following canine Cosequin products for personal use: Cosequin DS

21           Maximum Strength Chewable Tablets; Cosequin DS Maximum Strength Plus

22           MSM Chewable Tablets; and Cosequin DS Maximum Strength Plus MSM

23           Soft Chews.

24   ―――――――――――――――

25   that suggests plaintiffs are required to identify absent class members.  (Dkt. 123, Supp. Opp. at

26   8-9).  The Ninth Circuit has declined to require that plaintiffs "demonstrate that there is an
administratively feasible way to determine who is in the class."  Briseno v. ConAgra Foods, Inc.,

27   844 F.3d 1121, 1124 (9th Cir. 2017); see Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523,
535 (N.D. Cal. 2012) ("There is no requirement that the identity of class members be known at the

28   time of certification.") (cleaned up).

2.  Excluded from the class are defendants, as well as its officers, employees, agents or affiliates, and any judge who presides over this action, as well as all of defendants' past and present employees, officers and directors.

3.  The court hereby appoints Justin Lytle and Christine Musthaler as the representatives of the certified class.

4.  The court hereby appoints Milberg Coleman Bryson Phillips Grossman, PLLC and Levin Papantonio Rafferty as class counsel.

5.  Defendants' Motion to Exclude the Testimony of [] Bruce Silverman (**Document No. 109**) and Motion to Exclude the Opinions and Testimony of [] Dr. Jean Pierre Dubé (**Document No. 112**) are **denied**.

Dated this 6th day of May, 2022.


_____
/s/
Fernando M. Olguin
United States District Judge

**APP 36**

<u>**CERTIFICATE OF SERVICE**</u>

STATE OF CALIFORNIA        )
                                   ) ss
COUNTY OF LOS ANGELES    )

      I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 555 West Fifth Street, Suite 4000, Los Angeles, California 90013-1010.

      On May 20, 2022, I served the foregoing document described as: **PETITION FOR PERMISSION TO APPEAL ORDER GRANTING CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23(f)** on all interested parties in this action as follows:

            Daniel L. Warshaw
            dwarshaw@pswlaw.com
            Michael Harrison Pearson
            mpearson@pswlaw.com
            PEARSON, SIMON & WARSHAW, LLP
            15165 Ventura Blvd., Suite 400
            Sherman Oaks, CA 91403
            Tel: (818) 788-8300
            Fax: (818) 788-8104

            Adam A. Edwards
            aedwards@milberg.com
            Gregory F. Coleman
            gcoleman@milberg.com
            Jonathan B. Cohen
            jcohen@milberg.com
            MILBERG COLEMAN BRYSON
            PHILLIPS GROSSMAN, PLLC
            800 S. Gay St., Suite 1100
            Knoxville, TN 37929

Tel: (865) 247-0080
Fax: (865) 522-0049

Drew Hathaway
dhathaway@milberg.com
Daniel K. Bryson
dbryson@milberg.com
Milberg Coleman Bryson
Phillips Grossman, PLLC
900 W Morgan St
Raleigh, NC 27603
Tel: (919) 600-5000
Fax: (919) 600-5035

Brenton Goodman
bgoodman@levinlaw.com
Matthew D. Schultz
mschultz@levinlaw.com
Levin, Papantonio, Thomas,
Mitchell, Rafferty
& Proctor, PA
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel: (850) 435-7140
Fax: (850) 436-6171; (850) 436-6140

*Counsel for Plaintiffs*

☒ (VIA OVERNIGHT COURIER) I served the foregoing document(s) by FedEx for overnight delivery. I placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above. I placed each such envelope, with FedEx fees thereon fully prepaid, for collection and delivery at Sidley Austin LLP, Los Angeles, California. I am readily familiar with Sidley Austin LLP's practice for collection and

delivery of express carrier package for delivery with FedEx. Under that practice, the FedEx package(s) would be delivered to an authorized courier or dealer authorized by FedEx to receive document(s) on that same day in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 20, 2022, at Los Angeles, California.

/s/ *David R. Carpenter*
David R. Carpenter